I2QPHERT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ROBERTO HERRERA,

                    Plaintiff,

            v.                          16 CV 04297 (ER)
                                        BENCH TRIAL
GLORIA GENAO, ET AL.,

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        February 26, 2018
                                        9:08 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                        APPEARANCES

LAW OFFICE OF SCOTT A. LUCAS, ESQ.
        Attorney for Plaintiff
BY:   SCOTT A. LUCAS, ESQ.


SAMUEL & STEIN
        Attorneys for Defendants
BY:   MICHAEL S. SAMUEL, ESQ.
        RUCHAMA L. COHEN, ESQ.

I2QPHERT

1              (In open court)

2              (Case called)

3         MR. LUCAS:  Good morning, your Honor.  Scott Lucas,

4    Law Offices of Scott A. Lucas, for plaintiff, Roberto Herrera.

5         THE COURT:  Good morning.

6         MR. LUCAS:  Morning.

7         MR. SAMUEL:  Good morning, your Honor.  Michael Samuel

8    for the defendants, Star Parking.

9         THE COURT:  And good morning to you.  This matter is

10   on for a bench trial.  Mr. Lucas, what can you tell me about

11   your client?

12        MR. LUCAS:  Okay.  Your Honor, this is a wage and hour

13   case.  The plaintiff, Roberto Herrera, worked for the

14   defendants as a parking lot attendant.  He's owed unpaid

15   overtime, minimum wage, spread of hours pay and statutory

16   damages for wage notice violations.

17        The defendants' recordkeeping was beyond subpar and,

18   in this case, it was worse than that because there are

19   fabricated documents that have been produced in discovery,

20   which can easily be spotted as fabrications, and we'll show

21   that.  These same documents have been placed on the defendants'

22   own exhibit list.  I believe that will show that there is no

23   credibility of the defendants.  The main dispute is which hours

24   and times did plaintiff work, and then the evidence will show

25   that he worked the hours he said he worked.

I2QPHERT

1          THE COURT:  Which, as I understand it, is 84 hours per

2   week on average?

3          MR. LUCAS:  Yes.  Except the last three months it was

4   72 hours a week.

5          The parties have agreed on exhibits.  I have an

6   exhibit binder with plaintiff's four exhibits, pretty minimal.

7   If it would please the court, I could hand that up.

8          THE COURT:  Yes, please.  Thank you.  In addition to

9   Mr. Herrera, what other witnesses do you plan on calling?

10          MR. LUCAS:  We plan on calling Melissa Rodriguez,

11   Giribaldi Victorio, Frederico Collado, Jaime Rijo-Contreras and

12   Alvaro Vargas.

13          THE COURT:  Okay.

14          MR. LUCAS:  And, unfortunately, my own client and

15   these witnesses have not yet arrived.

16          THE COURT:  Okay.

17          MR. LUCAS:  Despite my admonition to be on time.  So I

18   have told the defendants' counsel that I certainly don't mind

19   if they want to start with their witnesses, and we can do

20   things out of order, unless the Court --

21          THE COURT:  Yes, let's do that because it's my hope,

22   anyway, that this case can be tried in one day.

23          MR. LUCAS:  Yes.

24          THE COURT:  Okay?  So, Mr. Samuel, do you want to give

25   me a summary of what you think the evidence will show?

I2QPHERT

1          MR. SAMUEL:  Sure, your Honor.  It's our contention

2     that the plaintiff only worked approximately 36 hours per week.

3     He worked Monday through Friday from approximately 7:00 a.m.

4     until about 2:00 p.m. every day, and that was only five days a

5     week, which comes to 35 hours per week.

6          Further, it's our contention he was paid properly.  He

7     was paid $9 per hour, which was the prevailing minimum wage at

8     the time, and as such, was compensated for all the hours that

9     he worked and he never worked overtime.

10         THE COURT:  He never worked overtime?

11         MR. SAMUEL:  That is correct; he did not work

12     overtime.

13         And just to plaintiff's counsel's point about

14     fabricated documents, my client is prepared to take the stand

15     and explain to the Court why those documents appear to be

16     fabricated, which are not fabricated, but, you know, she's

17     going to explain to the Court why the documents are what they

18     are.

19         THE COURT:  Okay.  Who do you plan on calling?

20         MR. SAMUEL:  We have the defendant, Gloria Genao; we

21     have her son, Kendrick, and her other son, Roberto, and we've

22     got a current employee, who will be able to testify about what

23     hours the plaintiff actually worked.

24         THE COURT:  Okay.  And are you prepared to proceed

25     with your witnesses?

I2QPHERT

1          MR. SAMUEL:  We can call Fernando.  We can call

2   Fernando.  He's the only one of our witnesses that needs a

3   translator.

4          THE COURT:  Okay.

5          MR. SAMUEL:  And I told my translator to come here

6   about 11:00, because I didn't expect that he would be called so

7   early.

8          THE COURT:  So we can't call Fernando.

9          MR. SAMUEL:  The only way that I think we can do it is

10  if we use the plaintiff's translator.

11         THE COURT:  Is the plaintiff's translator here?

12         MR. LUCAS:  Yes.  Yes, your Honor.

13         THE COURT:  Okay.  So then let's do that.

14         MR. LUCAS:  Okay.

15         THE COURT:  Okay.  By the way, I see four individuals,

16  at least five, in the gallery.  Are any of them going to be

17  witnesses?  And if so, do the parties not object to them being

18  in the courtroom?

19         MR. LUCAS:  I would prefer that the witnesses who are

20  non-parties not be in the courtroom, your Honor.

21         THE COURT:  Okay.  Are any of those individuals,

22  Mr. Samuels, to your knowledge, going to be witnesses?

23         MR. SAMUEL:  Yes.  I'll ask those two individuals to

24  step outside.

25         THE COURT:  Very good.  Thank you.

I2QPHERT

1          (Pause)

2          Okay.  And with that, Mr. Samuel -- oh, by the way,

3   before we get started, one of my individual rules was for the

4   parties to have submitted proposed findings of facts and

5   conclusions of law prior to trial.  That wasn't done.  However,

6   I will allow the parties to do that after the trial is

7   concluded.  Okay?

8          MR. LUCAS:  Yes, your Honor.

9          THE COURT:  Okay.  Mr. Samuel?

10          MR. SAMUEL:  Okay.  We would like to call Manuel

11   Fernando Guerrero to the stand, please.

12          THE COURT:  Okay.  Hello, Mr. Herrera.  Please step

13   up.  Please watch your step.  Please step up into the witness

14   box.  Yes, right here.  Please remain standing and raise your

15   right hand.

16          (Interpreter sworn)

17   MANUEL FERNANDO GUERRERO,

18      called as a witness by the Defendants,

19      having been duly sworn, testified as follows:

20          THE COURT:  Okay.  You may be seated.

21          MR. SAMUEL:  Your Honor, I have a copy of our exhibits

22   for the Court.

23          THE COURT:  Please.  Sorry, can we put the

24   interpreter's name on the record?

25          THE INTERPRETER:  Karin, with an "i," K-a-r-i-n,

I2QPHERT                    Guerrero - Direct

1   Figueroa, F-i-g-u-e-r-o-a.

2            THE COURT:  Thank you.

3   DIRECT EXAMINATION

4   BY MR. SAMUEL:

5   Q.  Good morning, Mr. Guerrero.  Are you currently employed?

6   A.  Yes.

7   Q.  And who are you employed by?

8   A.  Star, Star Parking?  I'm employed there.

9   Q.  Okay.  And can you tell the Court, please, what Star

10  Parking is?

11  A.  A parking lot.

12  Q.  Okay.  And do you know who owns Star Parking?

13  A.  Gloria Genao.

14  Q.  And is that the lady seated in the back?

15  A.  Yes.

16  Q.  Okay.  How long have you worked for Star Parking?

17  A.  It's been two years.

18  Q.  Okay.  And what is your position at Star Parking?

19  A.  I am the one that parks.

20  Q.  Okay.  And how did it come about that you started working

21  at Star Parking?

22  A.  I live close, next door to the parking, so I would always

23  stop around there.  I knew Roberto, myself.  Sometimes my

24  friends, they would leave me there at the parking, and then

25  they presented me to Mrs. Gloria, and I started to work on

1  Saturdays and Sundays.

2  Q.  Okay.  If we could just back up for a moment.  You said

3  that you lived near the parking lot?

4  A.  Yes, I do live there, next to the parking.

5  Q.  Okay.  And are you familiar with Roberto Herrera?

6  A.  No.

7  Q.  Do you know who the plaintiff in this case is?

8  A.  I became aware that -- I came here -- well, what can I say?

9  They put me as a witness.  Well, they got me that job right

10  there.

11  Q.  Well, who, for the first time, hired you to work at Star

12  Parking?

13  A.  He helped me.

14  Q.  And when you say "he," who are you referring to?

15  A.  Roberto Herrera.

16  Q.  And what did Mr. Herrera hire you to do?

17  A.  I met him there, and he would leave, and then I would stay

18  there in his place.  And then he presented me to Miss Gloria,

19  and then I started working Saturdays and Sundays.

20  Q.  But before the time that Mr. Herrera introduced you to

21  Ms. Genao, how long a period of time did you work for

22  Mr. Herrera at the lot?

23  A.  I had like 15, 20 days.

24  Q.  And were those whole days where you worked Mr. Herrera's

25  full shift, or were they part days?

1    A.  No, sometimes from 10:00 in the morning, sometimes from

2    2:00 in the afternoon.

3    Q.  Okay.  And did Mr. Herrera pay you to cover his shift?

4    A.  Yes, yes.

5            THE COURT:  I'm sorry, can I ask the question just so

6    I don't lose the stream here?

7            So it's Mr. Herrera, correct, you are?

8            THE WITNESS:  Yes, I am Guerrero.

9            THE COURT:  Guerrero, I apologize.

10           Now, so when you started working at the parking

11   garage, you would essentially take over the shift of

12   Mr. Herrera; is that right?

13           THE WITNESS:  Yes.  After I started with the company

14   Saturday and Sundays, sometimes his day to me, I would do that.

15           THE COURT:  And other days?

16           THE WITNESS:  Because I worked for the company

17   Saturdays and Sundays, and he had his days, and then he would

18   pay me and I worked those too.

19           THE COURT:  Okay.

20   BY MR. SAMUEL:

21   Q.  Okay.  Do you know what Mr. -- strike that.

22           How many days a week was Mr. Herrera scheduled to

23   work, if you know?

24   A.  Five days.

25   Q.  And do you know what times he was scheduled to work?

I2QPHERT                    Guerrero - Direct

1    A.  From 7:00 to 1:00.

2    Q.  Is that 7:00 a.m. to 1:00 p.m.?

3    A.  Yes, 7:00 in the morning to 1:00 in the afternoon.

4    Q.  Okay.  And that was five days per week?

5    A.  Yes.

6    Q.  Okay.  And you testified that you initially started working

7    Saturdays and Sundays at the lot?

8    A.  Yes, I would do Saturdays and Sundays.

9    Q.  And what hours would you work on Saturdays and Sundays?

10   A.  I worked from 7:00 to 2:00 in the afternoon.

11   Q.  Okay.  And how much did you get paid per hour?

12   A.  13.50.

13   Q.  Is that how much you're getting now, or how much you were

14   getting back in 2015?

15   A.  In 2015, I received 12.50.

16   Q.  Okay.  And what are you currently working, what is your

17   current shift?

18   A.  Right now, I'm from Monday to Friday, from 7:00 to 2:00 in

19   the afternoon.

20   Q.  Okay.  And for how long a period of time has that been your

21   shift?

22   A.  Since I started steady.

23   Q.  Okay.  And did you take someone else's shift over?

24   A.  If I got somebody else's shift?

25   Q.  Yes.  When you started working?

1    A.  Well, I did the shifts for him.  Like, he would tell me:

2    "Stand there" and then he would leave, just stay there, and I

3    would do my Saturdays and Sundays.

4    Q.  All right.  But my question is, when you started working

5    the weekdays, Monday to Friday, you told us your hours were

6    7:00 a.m. to 2:00 p.m.?

7    A.  2:00 in the afternoon.

8    Q.  And was that the same shift that Roberto Herrera used to

9    work?

10   A.  Yes.

11   Q.  Okay.  And did you take over his shift?

12   A.  After he was no longer in the company.

13   Q.  Okay.

14              THE COURT:  Could we put a date on that approximately?

15              THE INTERPRETER:  Is that a question?

16              THE COURT:  That is a question.

17   BY MR. SAMUEL:

18   Q.  Do you remember what year it was and month, possibly, that

19   you started working Mr. Herrera's shift?

20   A.  That was like -- it was after January of 2016.

21   Q.  And at 2:00 when your shift would end, who would take over

22   for you?

23   A.  A young one called Kendri comes in.

24   Q.  Is that Kendrick?

25   A.  Yes.

1    Q.   Okay.  And do you know if Gloria Genao works at the lot?

2    A.   Yes, she does, like two to three hours.

3    Q.   And do you know what times during the day that she does

4    those hours?

5    A.   In the afternoon.

6    Q.   And would that be after your shift?

7    A.   Sometimes after my shift comes Kendrick and/or after.

8           MR. SAMUEL:  Okay.  I have no further questions.

9    Thank you.

10          THE COURT:  Okay.  Cross-examination.

11   CROSS-EXAMINATION

12   BY MR. LUCAS:

13   Q.   Mr. Guerrero, is it correct that Roberto Herrera trained

14   you -- strike that.

15          To your knowledge, did there come a time when Roberto

16   Herrera took a trip to the Dominican Republic?

17   A.   Tell me again?

18   Q.   Did there come a time when Roberto Herrera took a trip to

19   the Dominican Republic?

20   A.   Yes.  Yes.

21   Q.   Okay.  And did Mr. Herrera ask you to fill in for him while

22   he was on that trip?

23   A.   Yes.

24   Q.   Okay.  And did you fill in for him while he was on that

25   trip?

1   A.   Yes.

2   Q.   Okay.  And when was that trip that Mr. Herrera took to the

3   Dominican Republic?

4   A.   I don't -- I don't have exactly.  I can't remember.

5   Q.   How long was Mr. Herrera gone on that trip to the Dominican

6   Republic?

7   A.   I'm not sure, but I think 15 to 20 days.  I'm not sure.

8   Q.   All right.  Now, you testified that you took over Roberto

9   Herrera's shift after January 2016; is that correct?

10  A.   Yes.  I was in Santo Domingo, and I think he called me

11  because he had a problem, and from then on, he no longer

12  continued working.

13  Q.   Okay.

14           THE COURT:  I'm sorry, who called you?

15           THE WITNESS:  When I was in Santo Domingo, Miss Gloria

16  called because he had a problem, and there was no personnel to

17  work at the parking.

18           THE COURT:  When you say "he had a problem," are you

19  referring to Roberto Herrera?

20           THE WITNESS:  Yes.

21  BY MR. LUCAS:

22  Q.   Okay.  So when Roberto Herrera's employment ended, that's

23  when you took over his shift, correct?

24  A.   Perfect.

25  Q.   Okay.  And you testified earlier that you started working

I2QPHERT                          Guerrero - Cross

1   on Saturdays and Sundays?

2   A.   Saturday and Sunday was through the company I was with.

3   Q.   Can you explain that answer?

4   A.   Look, I would do half a day and they would -- for him.

5   After, I started working Saturdays and Sundays through the

6   company.  After Mr. Robert went to Santo Domingo, then I did

7   that time for him.  Then I went to Santo Domingo, and when I

8   was in Santo Domingo, then Miss Gloria called me that they have

9   had an issue, a problem.  After that problem, he no longer

10  continued working in the company, and that's when I went.

11  Q.   Okay.  Did you say that on Saturday and Sunday you worked

12  one-half day for Roberto Herrera and one full day for him?

13         MR. SAMUEL:  Objection.

14         THE COURT:  Overruled.

15  A.   No.  Saturdays and Sundays didn't belong to anybody.

16  Q.   When was the first time that you worked a Saturday and

17  Sunday for Roberto Herrera's shift?

18         MR. SAMUEL:  Objection, your Honor.  I don't think

19  that was the testimony.

20         THE COURT:  The objection is overruled.

21  A.   No, those were not his shifts.

22  Q.   Okay.  Let me rephrase.  When was the first time you worked

23  a Saturday and a Sunday for the company?

24  A.   I don't have an exact date.

25  Q.   What's your best recollection?

I2QPHERT                          Guerrero - Cross

1   A.  Like, what can I say?  The same time I started working

2   there.  I know it's 2015, but I can't tell you an exact date.

3   Q.  Was it before or after Mr. Herrera went to Dominican

4   Republic?

5   A.  Before going to the Republic.

6   Q.  How soon before then?

7   A.  Around one to two weeks before.  I don't know exactly.

8   Q.  So for one or two weeks before Mr. Herrera went to the

9   Dominican Republic, you worked a Saturday and Sunday for the

10  company; is that your testimony?

11  A.  For the company.

12  Q.  And when did you go to Santo Domingo?

13  A.  After he came back from Santo Domingo.

14  Q.  Okay.  How soon after?

15  A.  Like, a week and change, a week and something after.

16  Q.  Okay.  Was the parking lot open 24 hours a day?

17  A.  Yes.

18  Q.  Seven days a week?

19  A.  Yes.

20  Q.  Okay.  And when you showed up at 7:00 a.m. to start your

21  shift, did you take over for somebody?

22  A.  Right now?

23  Q.  No, back, let's say -- let me clarify the question.

24          In the one or two weeks before Roberto Herrera went to

25  the Dominican Republic, when you say that you worked one or two

1   weekends, on those occasions when you showed up for work, did

2   you take over for a parking lot attendant who was working

3   overnight?

4   A.  When you're talking about Saturday and Sunday, or you're

5   talking about the other?

6   Q.  Saturday and Sunday.

7   A.  No, I worked during the day, from 7:00 in the morning to

8   2:00 in the afternoon.

9   Q.  Right.  And on those one or two weekends when you showed up

10  to work, did you relieve an overnight parking lot attendant who

11  had been working the night before?

12          THE INTERPRETER:  Did you relieve?

13  Q.  Yes.  Did you take over from the person who was working the

14  previous shift?

15  A.  They already gave me -- designated me that shift.

16  Q.  On those two weekends, one or two weekends, who was working

17  the shift prior to 7:00 in the morning?

18  A.  The one that working through dawn.

19  Q.  Can I have that answer repeated?  I'm sorry.

20          THE INTERPRETER:  The one that was working through

21  dawn.

22          THE COURT:  It was a question.

23          THE INTERPRETER:  It was a question?

24  BY MR. LUCAS:

25  Q.  Who is Dawn?

1        THE COURT:  Dawn, like in dawn in the morning?

2        MR. LUCAS:  Oh, I see.

3    Q.  And which person is that?

4    A.  The one that I would come in after the one that's working

5    through dawn?

6    Q.  Does the person who worked through dawn have a name?

7    A.  Oh, he's called Julio.

8    Q.  Julio.  Okay.  And what was Julio's shift at that time?

9    A.  From 12:00 to 7:00.

10   Q.  12:00 midnight?

11   A.  Yes, midnight to 7:00 in the morning, and then I would come

12   in.

13   Q.  Okay.  Earlier you testified that Roberto Herrera worked

14   from 7:00 to 1:00?

15   A.  Yes.

16   Q.  And you also testified that he worked from 7:00 to 2:00?

17   A.  Yes, depends.  The one that would be coming in next, if he

18   had arrived or not.

19   Q.  So you testified, in 2015, you were paid $12.50?

20   A.  Yes.

21   Q.  Did you ever get any kind of written wage notice stating

22   that fact?

23   A.  What I was going to be earning?

24   Q.  Yes.

25   A.  She would tell me when I started working.

 1    Q.  Okay.  But did you receive any kind of written notice of
 2    what your pay rate would be?
 3    A.  No, because it would come on the checks that I would get.
 4    Q.  Were you paid by check?
 5    A.  Yes.
 6    Q.  Were you paid by check in 2015?
 7    A.  Yes.
 8    Q.  When was your pay rate changed to 13.50 an hour?
 9    A.  After, when I started from Monday to Friday.
10    Q.  When was that?
11    A.  That was at the same time that Robert left from there.
12    Q.  Did you ever see anyone else -- strike that.
13            On the one or two Saturdays and Sundays that you
14    worked before Roberto went to Santo Domingo, did you see anyone
15    else parking cars at the parking lot during your shift?
16    A.  In my shift, if somebody else was parking vehicles?
17    Q.  In your shift, were you the only person who parked
18    vehicles?
19    A.  On my shift, yes.
20    Q.  Okay.  And do you have any written proof that you were ever
21    paid by check in 2015?
22    A.  I had the copy of that.  I don't know if right now I have
23    this because I was giving it so I could report it, but not -- I
24    have the ones for this time.
25    Q.  I see.  Is it correct, sir, that Sunday was payday?

I2QPHERT                    Guerrero - Cross

1    A.  Yes.

2    Q.  Okay.  And did you ever see Roberto Herrera get paid by

3    check?

4    A.  No, because I would just see mine.

5    Q.  You mentioned someone named Kendrick?

6    A.  Yes.

7    Q.  What shift did Kendrick work?

8    A.  He would come in after I worked Saturday and Sunday.

9    Q.  Okay.  And how long would he work?

10   A.  He would come in my shift -- sorry, sorry.  After I would

11   leave at 1:00, he would come in and then I would leave.  Then I

12   don't have -- I can't say if he continued working then, and

13   then after Kendrick would come, the ones that would work the

14   early hours shift.

15   Q.  When did Kendrick first take over for you at the end of

16   your shift?

17   A.  Not my shift.  I was from 7:00 to 2:00, and then he would

18   enter from 2:00 to 7:00 -- 2:00 to 11:00.

19   Q.  Okay.  And when did he first work from 2:00 to 11:00?

20   A.  When I started working, he had that shift.

21   Q.  Okay.

22            MR. LUCAS:  No further questions of this witness.

23            THE COURT:  Any redirect?

24            MR. SAMUEL:  No, your Honor.

25            THE COURT:  Okay.  Sir, you may step down.

1          (Witness excused)

2          Mr. Lucas, do you want to check very quickly to see if

3     your client is here or one of your witnesses is here?

4          MR. LUCAS:  Yes.  Yes.  Thank you, your Honor.

5          THE COURT:  And if not, Mr. Samuel, do you have

6     someone you can call next?

7          MR. SAMUEL:  I do, but I prefer to hear from the

8     plaintiff first, but we have other witnesses.

9          THE COURT:  Okay.  So I may ask you to go ahead.

10          MR. LUCAS:  There's no one out in the hallway.  If the

11     Court didn't object, I wouldn't mind going down to security and

12     checking my phone to make sure no one got lost or anything like

13     that.  I was pretty explicit.

14          THE COURT:  Why don't you take five minutes and do

15     that.

16          MR. LUCAS:  Okay.  Thank you, your Honor.

17          THE COURT:  But five minutes, please.

18          MR. LUCAS:  I'll be right back.

19          (Recess)

20          THE COURT:  Is this Mr. Herrera?

21          MR. LUCAS:  Yes.

22          THE COURT:  Do you want to call him next?

23          MR. LUCAS:  Yes.

24          THE COURT:  Does Mr. Herrera need an interpreter?

25          MR. LUCAS:  Yes.

1    THE COURT:  Okay.  Is everybody ready?  Please step up

2    and into the witness box, right here, and remain standing.

3    ROBERTO HERRERA,

4         called as a witness by the Plaintiff,

5         having been duly sworn, testified as follows:

6         THE COURT:  You can be seated.  Please pull your set

7    up to the microphone.  Please speak directly into the

8    microphone, and also so that the interpreter can hear, and

9    please begin.  Please begin by stating your full name and

10   spelling your last name for the record.

11        THE WITNESS:  Roberto Herrera Rojas.

12        THE COURT:  And spell your last name.

13        THE WITNESS:  H-e-r-r-e-r-a.

14        THE COURT:  Okay.  Mr. Lucas, you may proceed.

15        MR. LUCAS:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MR. LUCAS:

18   Q.  Mr. Herrera, did there come a time when you began working

19   for Star Parking 2?

20        THE INTERPRETER:  Star?

21   Q.  Star Parking 2.

22   A.  At what time?

23   Q.  Right.  Did there come a point in time when you began

24   working as a parking lot attendant for Star Parking?

25   A.  Yes.

1   Q.  Okay.  And that was also known as Star Parking 2?

2   A.  Yes.

3   Q.  Okay.  When did you start working for Star Parking?

4   A.  January 2015.

5   Q.  Okay.  And did there come a time when you interviewed for a

6   job with Star Parking?

7   A.  Yes.

8   Q.  When was that?

9   A.  January.

10  Q.  Of?

11  A.  Of 2015.

12  Q.  Okay.  And who interviewed you?

13  A.  An employee, Julio, and Miss Gloria.

14  Q.  During that interview, what, if anything, were you told

15  about the days of the week you'd have to work?

16  A.  I had to work seven days of the week, from 8:00 in the

17  morning to 8:00 in the evening.

18  Q.  Okay.  During that interview, what, if anything, were you

19  told about the pay that you would receive for working those

20  hours?

21  A.  I was going to get 490 every Sunday.

22  Q.  Did you accept the job?

23  A.  Yes.

24  Q.  Did anyone train you?

25  A.  Yes.

I2QPHERT                         Herrera – Direct

1    Q.  Who trained you?

2    A.  Julio.

3    Q.  Did anyone else train you?

4    A.  Julio, the practical part, and Gloria, the theoretical

5    part.

6    Q.  When you say "the theoretical part," what do you mean?

7    A.  How to fill out the payment, how to pass the credit card

8    through, and how to fill out the ticket that you put in the

9    cars.

10   Q.  Okay.  And how long did your training last?

11   A.  One day, one evening.

12   Q.  And did you start working after that?

13   A.  Yes.

14   Q.  Okay.  Were there any times when the parking lot was

15   closed?

16   A.  Never.

17   Q.  What about holidays?

18   A.  They were all worked.

19   Q.  Do you mean they were always open?

20   A.  Yes.

21   Q.  Did there come a time when you took a trip to the Dominican

22   Republic?

23   A.  Yes.

24   Q.  When was that?

25   A.  I left November 10th, came back November 25th.

1    Q.  What year?

2    A.  Of 2016.

3    Q.  How do you know those dates are correct?

4    A.  Because I have the passport here, I can prove it.

5    Q.  Okay.

6    A.  2015, 2015.  Yes, I rectify, 2015.

7    Q.  And if defense counsel wanted to see your passport, would

8    you have any objection to that?

9    A.  Of course I'd show it.

10   Q.  Okay.  Did you work the day before you went to Santo

11   Domingo?

12   A.  Yes.

13   Q.  Did you work the day after you returned from Santo Domingo?

14   A.  Yes.

15   Q.  Did you arrange for someone to fill in for you while you

16   were in Santo Domingo?

17   A.  Yes.

18   Q.  Who was that?

19   A.  A guy called Fernando worked.

20   Q.  Fernando Guerrero?

21   A.  Yes.

22   Q.  Did Fernando Guerrero work for the parking lot at any time

23   before you went to Santo Domingo?

24   A.  No.

25   Q.  How do you know that?

1   A.  Because there were just two of us.

2   Q.  You were one of them?

3   A.  Yes.

4   Q.  Who was the other?

5   A.  Me and Julio.

6   Q.  When did Julio work?

7   A.  Julio, I arrived, he was there.

8   Q.  Right.

9   A.  He's the one that worked in the evenings.

10  Q.  What were his work hours?

11  A.  8:00 in the evening to 8:00 in the morning.

12  Q.  Did there come a time when you asked Gloria Genao if you

13  could work less than seven days a week?

14  A.  Yes.

15  Q.  Okay.  When was that?

16  A.  When I already had like almost a year there, a year, and I

17  was tired of lasting so long working.  I was exhausted.

18  Q.  Can you give us a month when you asked Gloria if you could

19  work less than seven days?

20  A.  After -- then, after I came from Santo Domingo, after I

21  came from Santo Domingo, I told her I couldn't work that much.

22  She answered that I should find somebody and train them myself

23  because I'm responsible for that -- and I would be responsible

24  for that person.

25  Q.  And did you find someone else?

1    A.  Yes.

2    Q.  And who was that person?

3    A.  Alvaro.

4    Q.  Does Alvaro have a last name that you know?

5    A.  I think it's Varga, Vargo.

6    Q.  And how long did it take you to train Alvaro?

7    A.  Alvaro lasted like a week.

8    Q.  He only worked for one week?

9    A.  No, he trained, more or less.

10   Q.  Okay.  So he trained, more or less, for one week?

11   A.  Yes, with me.  He would spend all day there with me at the

12   parking.

13   Q.  Okay.  And after that training period, did he begin working

14   part of the time?

15   A.  One day.  One day mine and one day in the evening.

16   Q.  When you say in the evening, do you mean one shift for

17   Julio and one shift for you?

18   A.  Alvaro would cover one of my shifts of the days and one for

19   Julio in the evening, in the week.

20   Q.  And did that arrangement continue for the remainder of your

21   employment?

22   A.  Yes.

23           THE COURT:  So once you found your replacement, you

24   were working six days a week, 12 hours a day?

25           THE WITNESS:  Yes.

1   BY MR. LUCAS:

2   Q.  And how was Alvaro paid?

3   A.  Cash.  I would pay him my day, and Julio would pay him his

4   day.

5   Q.  And why would you pay him from your own money?

6   A.  Because when the week would come, Gloria, when she would

7   pay when the week would come, everything was paid all together.

8   Q.  Did Gloria ever tell you that you were responsible for

9   paying Alvaro?

10  A.  If I wanted, I could pay him.  If he couldn't wait for the

11  weekend that she was paying on, I would pay it and then Gloria

12  would pay to me.  That's how Julio was done, too.  Julio would

13  give cash, and then she would pay Julio.

14  Q.  After you started working six days a week, did you still

15  get to keep $490 a week for yourself?

16  A.  Yes.  When I would take from mine, then to Alvaro.

17  Q.  Are you saying that you would get the $490, and then you

18  would pay a portion of that to Alvaro?

19  A.  I would give the money on the same day to Alvaro.  I will

20  get the money for me.  If I didn't have the money to pay him

21  that day, when I would deposit that, I would get that and then

22  pay.

23  Q.  How much did you pay Alvaro when you paid him?

24  A.  $70 -- I mean, 70 bucks.

25  Q.  So is it your testimony that you would get to keep $420 a

1   week during the time that you worked six days per week?

2   A.  She would pay me 490, and then I would pay Alvaro first,

3   when he would do it.

4   Q.  Okay.  Apart from your trip to the Dominican Republic and

5   the one day a week that Alvaro worked for you for the latter

6   part of your employment, were there any other days that you did

7   not work at the parking lot?

8   A.  No.  Hours.

9   Q.  Can you explain that answer?

10  A.  Like, when I needed like an hour or two hours, I would pay

11  to Fernando, because he was a neighbor.  He would handle that

12  little while, and that's it.

13  Q.  And on those occasions when you needed one or two hours and

14  had Fernando cover you, who paid Fernando?

15  A.  Me.

16  Q.  Okay.  How many times did Fernando cover you for one to two

17  hours?

18  A.  I don't remember how many, but more or less very few.

19  Q.  More than three or less than three?

20  A.  More or less, you're talking about days or time?

21  Q.  No.  I'm trying to find out how many one- to two-hour

22  periods of time did Fernando cover for you?

23  A.  Could have been five or six times at the time I was there.

24  Q.  And when was the first such time?

25  A.  Oh, I don't remember exactly.

I2QPHERT                          Herrera - Direct

1    Q.  Was it before or after you went to Santo Domingo?

2    A.  Before, before going to Santo Domingo.

3    Q.  How much before?

4    A.  Previous, like to the days I was leaving, let's say.  That

5    was November, the beginning of November.

6    Q.  Okay.  So okay.  2015, you're talking about?

7    A.  Yes.

8    Q.  Was there a particular day of the week when you got paid?

9    A.  Yes.

10   Q.  What day was that?

11   A.  Sundays.

12   Q.  And who paid you?

13   A.  Gloria.

14   Q.  Did anyone else pay you?

15   A.  And her son.

16   Q.  Do you know her son's name?

17   A.  No.

18           THE COURT:  By the way, her son is here.

19           MR. LUCAS:  Right.

20           THE COURT:  Do you want to have him step out, please?

21           MR. SAMUEL:  Oh, I'm sorry.  Yes.

22           MR. LUCAS:  I would just like to let the record

23   reflect that one of defendants' witnesses has been sitting in

24   the courtroom for Mr. Herrera's testimony.  Obviously, it was a

25   mixup because defense counsel had anticipated calling Kendrick,

1    I think his name is, to the stand.

2              THE COURT:  The record will so reflect.  I believe

3    your last question was whether it was Kendrick that sometimes

4    paid him.

5              MR. LUCAS:  I think there's two children here today.

6    I don't know if one is from Mr. Vasquez and one is from

7    Ms. Genao.  Maybe defense counsel could tell us.  I don't

8    really know which one actually sometimes paid Mr. Herrera.

9    Maybe call them both in and just to see if Mr. Herrera can

10   identify which one.

11             THE COURT:  Why don't you ask Mr. Herrera.

12             MR. LUCAS:  What would I ask him?

13             THE COURT:  Ask him who paid him.

14             MR. LUCAS:  Yes, he doesn't know the name, he said.

15             THE COURT:  Okay.

16             MR. LUCAS:  Maybe we can jump back to that question

17   when they get back in the courtroom.

18             THE COURT:  Okay.  Well, I'm sorry.

19             Mr. Herrera, there was an individual sitting next to

20   Ms. Genao; did you see him?

21             THE WITNESS:  Yes.

22             THE COURT:  Did you recognize him?

23             THE WITNESS:  Yes.

24             THE COURT:  Who did you recognize him to be?

25             THE WITNESS:  Her son.

1          THE COURT:  And do you know his name?

2          THE WITNESS:  No.

3          THE COURT:  And you said earlier that you would be

4    paid either by Ms. Genao or by her son?

5          THE WITNESS:  Yes.

6          THE COURT:  Was that the son that paid you?

7          THE WITNESS:  Yes.

8          MR. LUCAS:  Nicely done, your Honor.  Thank you.

9    BY MR. LUCAS:

10   Q.  Did Gloria's son ever work parking cars at the lot that you

11   worked at during the time that you were employed?

12   A.  No.

13   Q.  Did Gloria ever work parking cars at the lot you worked at

14   during the time you were employed?

15   A.  No.

16   Q.  On the days -- on the Sundays when Gloria showed up to pay

17   you, had she already been working typically that day, or did

18   she just show up to pay you?

19   A.  Just to pay and collect -- and collect the reports.

20   Q.  What about on the Sundays when Gloria's son paid you, did

21   he work at the parking lot on those days, apart from paying

22   you?

23   A.  No.

24   Q.  During the time you were employed, did anyone else park or

25   retrieve cars during your shift, besides you?

I2QPHERT                      Herrera - Direct

1   A.  No.

2   Q.  Do you know what the parking lot's legal capacity was?

3           THE INTERPRETER:  The parking lot's legal?

4   Q.  Do you know what the parking lot's legal capacity was?

5   A.  I do believe -- I believe to remember that it was 33.

6   Q.  Okay.  And were ever more than 33 cars parked there?

7   A.  Yes.

8   Q.  How many cars would get parked there?

9           MR. SAMUEL:  Objection to relevance, your Honor.

10  A.  Up to --

11          THE INTERPRETER:  I'm sorry.

12          THE COURT:  Do you want to make a proffer, Mr. Lucas?

13          MR. LUCAS:  Yes.  It's directly relevant to the issue

14  of whether there's individual coverage under the FLSA because

15  it affects interstate commerce.

16          THE COURT:  How does the number of cars do that?

17          MR. LUCAS:  By taking more than the legal capacity, it

18  removes congestion on the streets, and thereby effects

19  interstate commerce, I would proffer, and propose that that's a

20  far more direct impact than the leading Supreme Court case

21  where growing weed on one's own property for one's own

22  consumption could be deemed to effect interstate commerce.

23  Plus, I have a case law, which I'll include in our post-trial

24  briefing, that supports our view.

25          THE COURT:  Very well.  It's a creative theory, but

1    I'll take it for now.  You can answer.

2    A.  52.

3    Q.  Okay.  And did you ever park any vehicles of customers on

4    the street?

5    A.  Just one.

6    Q.  Okay.  When was that?

7    A.  It was when there was a snowstorm, clients that arrived

8    that were like the monthly clients, and I had to stay with one

9    of those cars until one of the daily clients would leave.

10   Q.  Did the parking lot have cameras?

11   A.  Yes.

12   Q.  How many?

13   A.  I think, more or less, eight.

14   Q.  To your knowledge, were they operational?

15   A.  Well, they were changed.  One would damage here, another

16   would damage there.  They would change it.

17   Q.  To your knowledge, were any of those cameras ever

18   monitored?

19   A.  Yes.  There was always a monitor there that would show

20   everything.

21   Q.  Okay.  And when you say "there," what do you mean?

22   A.  In the cabin where you're working, there's a monitor that

23   presents all the cameras.

24   Q.  Okay.  And to your knowledge, did Gloria ever monitor the

25   cameras?

 1  A.  Julio would say yes, through the phone, and Julio would

 2  also monitor that because he would call me as well.

 3           MR. SAMUEL:  Objection, your Honor.  It's hearsay.

 4           THE COURT:  Overruled.

 5  Q.  Did you ever see any family member of Gloria Genao park or

 6  retrieve a customer's car?

 7           THE INTERPRETER:  Did you ever see family members of

 8  Gloria what?

 9  Q.  Park or retrieve a customer's car.

10  A.  Yes.

11  Q.  Who was that, and when did that happen?

12  A.  Supposedly, it was a nephew.

13  Q.  Do you know that person's name?

14  A.  No.  I just saw him twice.

15  Q.  Twice?

16  A.  Yes.

17  Q.  And on those two occasions, was he working a shift for

18  somebody?

19  A.  The evening time.

20  Q.  Okay.  Was that on both occasions?

21  A.  Yes.

22  Q.  At the beginning of your shift, did you have to speak with

23  the person you were relieving?

24           THE INTERPRETER:  That you would be?

25  Q.  That you were relieving?

1    A.  No.

2    Q.  When you started your shift at 8:00 in the morning, who did

3    you take over for?

4    A.  When Julio would leave, I would come in.

5    Q.  And when you came in, did you speak with Julio?

6    A.  Yes.

7    Q.  What did you speak about?

8    A.  We would greet each other.  He would say such client is

9    going to leave at such time, like that.

10   Q.  And how long did you speak with Julio, typically, when you

11   arrived for your shift?

12   A.  Two minutes, three minutes.

13   Q.  Okay.  And at the end of your shift, did you also speak to

14   Julio?

15   A.  Yes, the same.

16   Q.  When you came to work to start your shift, did you ever

17   relieve any family member of Gloria Genao or Roberto Vasquez?

18           THE INTERPRETER:  Did you ever relieve?

19   Q.  Did you ever take over?

20   A.  No.

21   Q.  Did any child of Gloria Genao or Roberto Vasquez ever

22   assist you in any way in performing your duties as a parking

23   lot attendant?

24   A.  No, just Julio commented that before me, Robert's son or

25   son of Robert was going, but he was -- he would go out with the

1     Zipcar, the rental cars.  He would go around, driving on them;

2     so then that's why they didn't have him there anymore.  So I

3     never saw him.

4     Q.  Let me ask you a couple of questions about the overnight

5     attendant, Julio.  Did there come a time when Julio's schedule

6     changed?

7     A.  That it changed?

8     Q.  Did there come a time when Julio became sick?

9     A.  Yes.

10    Q.  Did that sickness have any impact on Julio's schedule?

11    A.  It was just -- well, it wasn't much time.  The ambulance

12    was there and got him right there, and then I remember that I

13    covered a day, and then the other days Gloria would look for

14    somebody to cover it.  It wasn't any -- it was like three days.

15    Q.  Did there come a time when Fernando Guerrero worked part of

16    the time for Julio's shifts?

17    A.  Yes.

18    Q.  When was that?

19    A.  After the sickness.

20    Q.  And how long did Fernando Guerrero cover part of Julio's

21    shifts?

22    A.  Almost when I was leaving.  Almost when I was about to

23    leave.

24    Q.  Okay.  Were you at work on February 3rd, 2016?

25    A.  Yes.  They arrested me that day, at work.

1   Q.  So you missed that day at work?

2   A.  Yes.

3   Q.  Okay.  And were you ever convicted of anything?

4   A.  I wasn't convicted at all.  They had me detained for the

5   day because the jealous lady, she called the police and soon

6   after Gloria did a report regarding the accident with my car

7   documents.  Thank God, I was able to prove that to justice,

8   that I was arrested that same date, that I wasn't able -- I

9   would not be able to have been in that accident.  That's what

10  one of the reasons I left work, for being scared of getting

11  into problems.

12          THE COURT:  I'm sorry, could I just ask that he

13  clarify some of that?

14          MR. LUCAS:  Please.

15          THE COURT:  So, Mr. Herrera --

16          THE INTERPRETER:  I'm sorry.

17  A.  Being put into problems.

18          THE COURT:  So you were arrested on February 3rd,

19  2016?

20          THE WITNESS:  Yes, 8:00 in the morning, when I arrived

21  to work.

22          THE COURT:  And at some point thereafter, you said

23  that Ms. Genao filed some sort of a report against you?

24          THE INTERPRETER:  You said against you?

25          THE COURT:  Yes.

I2QPHERT                        Herrera - Direct

THE WITNESS:  Yes, an accident with my documents.  She got it from the car that had been left there.

THE COURT:  What do you mean an accident?

THE WITNESS:  I didn't know about what accident it was because I was detained that day, arrested.

THE COURT:  But it was a car accident?

THE WITNESS:  A car, supposedly, because I don't know. I was arrested.

THE COURT:  And who did she report that accident to?

THE INTERPRETER:  Who did you report that accident to?

THE COURT:  Who did she report that accident to?

THE WITNESS:  Like, as if it had been me.

THE COURT:  Yes, but who did she tell that to?  Was it the police?

THE WITNESS:  She did a report with the police.  I realized that she had done that report because the person that was there told me that if I had made myself responsible for an accident, and I said no, I don't know what accident they're talking about.  So he told me, well, Gloria did this report about an accident, and the police gave me the documents of this car.  So I called Gloria at that moment, and she said, yes, that she had forgotten to tell me, but that nothing was going to happen.

THE COURT:  Can I stop you?  Okay.  Now, you said my documents, they used my documents.  What documents did they

1    use?

2              THE WITNESS:  The car one.

3              THE COURT:  What does that mean?

4              THE WITNESS:  The VIN number of the car.

5              THE COURT:  And was it your car?

6              THE WITNESS:  My car.  Because when they arrested me,

7    it was left there.

8              THE COURT:  I'm trying to figure this out.  Now, I

9    understand what you say, that you didn't have an accident, but

10   you became aware, at some point in time, that Gloria Genao had

11   told the police that your car was involved in an accident?

12             THE WITNESS:  No.

13             THE COURT:  Where was the accident?  Was the accident

14   at the garage?

15             THE WITNESS:  No, I don't know what accident.

16             THE COURT:  Okay.  But she told the police that the

17   person who was involved in the accident is the person that owns

18   that car, your car?

19             THE WITNESS:  Could be.  All I know is that when I

20   went to the precinct and I asked for that, that they said, yes,

21   that I had had an accident.  At the precinct, they told me.  I

22   said, no, I didn't have any accident.  I don't know what they

23   were talking about.  The officer asked -- the officer said:

24   How can you prove, then, that you were not in the accident?  It

25   says it in our report.  So I said:  I was arrested in that same

1    precinct, and then I presented the documents.  She saw the time

2    that I was incarcerated, from 8:00, and she saw that I had been

3    incarcerated since 8:00, and the accident says in the report

4    that it's sometime after, like, from 11:00.

5            THE COURT:  Now, let me ask you this.  At some point,

6    you called Gloria Genao about that report?

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.  Tell me about that conversation?

9            THE WITNESS:  I asked:  Is it true that you did a

10   report on my behalf?  She said:  Oh, yes.  I forgot to tell

11   you.  Don't worry.  Nothing is going to happen to you.  You

12   know that I take care of it.  I felt scared at that moment, and

13   I went to the precinct to verify.  That's when I went to ask,

14   and that had been already pending that that had happened, and I

15   didn't know about it and, yeah, I didn't know about it.

16           MR. LUCAS:  If I could interject something here, your

17   Honor?

18           THE COURT:  Sure.

19           MR. LUCAS:  The parties have stipulated to the last

20   date of Mr. Herrera's employment being February 28, 2016.

21   That's in the pretrial order.  So although this whole accident

22   situation may be interesting, I'm not sure that it's really

23   relevant.

24           THE COURT:  Well, I only asked because he brought it

25   up.

1           MR. LUCAS:  I understand.  I understand.  And with the

2    knowledge that we've all agreed on the last date of

3    Mr. Herrera's employment, I would propose saving us all some

4    time by moving to the next topic.

5           THE COURT:  Please.

6           MR. LUCAS:  Thank you, your Honor.

7    BY MR. LUCAS:

8    Q.  When did you start driving that car to work, Mr. Herrera?

9    A.  She sold it to me when it had been crashed already.  So

10   when she charged it, and when she fully got paid for it, then

11   she gave me the title.

12   Q.  "She" meaning Gloria?

13   A.  Yes.

14   Q.  When did you buy that car from her?

15   A.  I don't remember specifically the date, but since I

16   entered -- since I started, I said I needed a car, that she

17   said that there were a few, like three, vehicles and which one

18   would I want.  And then I was paying it at a pace, and then

19   when I would pay it off, she would give me the title.

20   Q.  Did you first start driving a car to work before or after

21   you went to Santo Domingo?

22   A.  I think after.  I don't remember very well.  Before.  I

23   remembered.  Before.

24   Q.  How much before?

25   A.  I remember it's before I left it there at the same parking,

1    and when as soon as I came, I found it being scratched.

2    Q.  Okay.  But how long before you went to Santo Domingo did

3    you start driving a car to work?

4    A.  I don't remember exactly.

5    Q.  Was it more than one month before or less than one month

6    before?

7    A.  More than a month before, more or less, like three or four

8    months.

9    Q.  Did you process credit cards from customers when you worked

10   at the parking lot?

11   A.  Yes.

12   Q.  Okay.  When you received your pay on Sundays, were you

13   required to sign a sheet?

14   A.  Sign, sign a sheet.

15   Q.  Were you required a sign a sheet of paper?

16   A.  Yes.

17   Q.  Okay.

18          MR. LUCAS:  Your Honor, may I approach the witness to

19   hand an exhibit?

20          THE COURT:  You may.

21   BY MR. LUCAS:

22   Q.  Mr. Herrera, I am showing you what's been marked as

23   Plaintiff's Exhibit 1, the first -- just the first page only.

24   Can you identify that document?

25   A.  Yes.

I2QPHERT                          Herrera - Direct

1    Q.  Does your signature appear in several places on that

2    document?

3    A.  Yes.

4    Q.  Okay.  Can you explain why the first six columns of that

5    document are blank?

6           MR. SAMUEL:  Just note my objection to the form of the

7    question.

8           THE COURT:  So noted.  You can answer.

9    A.  No, I don't know why.  They would just tell us to sign

10   there.

11   Q.  Is this the type of document that you had to sign on

12   payday?

13   A.  Yes.

14   Q.  Okay.  Now, I would like you to look at the next page,

15   which is Plaintiff's Exhibit 2, and I would like you to compare

16   Plaintiff's Exhibit 1, the first page, with Plaintiff's Exhibit

17   2, the second page.

18   A.  What should I compare?

19   Q.  Okay.  Can you tell me if the information in the two

20   columns to the right is the same in those two documents except

21   at the very bottom?

22          THE INTERPRETER:  Except for?

23   Q.  Except at the very bottom part of the exhibit?

24   A.  You mean these ones?

25          THE COURT:  What do you mean?

1           MR. LUCAS:  May I approach?

2           THE COURT:  Yes.

3    A.  Yes.

4    Q.  Yes, the information is the same?

5    A.  It says the same, but one is like really small and these

6    are big.

7    Q.  Okay.  Let me direct your attention just to Plaintiff's

8    Exhibit 1.  Did there come a time when you took a photograph of

9    one of the sheets that you had to sign on Sunday?

10   A.  Yes.

11   Q.  Is that Plaintiff's Exhibit 1?

12   A.  Yes.

13   Q.  Okay.  Did you ever sign a sheet like this on Sunday that

14   had the rest of the information filled in in the first six

15   columns to the left?

16   A.  No.

17   Q.  Please look at Plaintiff's Exhibit 2, the second page.

18   When you signed this document, were the six columns to the left

19   filled in?

20   A.  No.

21           THE COURT:  Let me ask.  When you signed it, this

22   document, did it look like Plaintiff's Exhibit 1?

23           THE WITNESS:  Yes.

24   BY MR. LUCAS:

25   Q.  Mr. Herrera, did you ever receive a written wage notice

1    form explaining the basis for your pay?

2              THE INTERPRETER:  Explain your?

3    Q.  Explaining your pay rate?

4    A.  No.

5    Q.  Mr. Herrera, please look at Plaintiff's Exhibit 3, the next

6    document.

7    A.  I didn't sign this.

8    Q.  When was the first time that you saw Plaintiff's Exhibit 3,

9    was it before or after this lawsuit was filed?

10   A.  I've never seen this document.  At work, never seen this

11   document, just Page 1.

12   Q.  Okay.  Mr. Herrera, please look at the signature on

13   Plaintiff's Exhibit 3.  Is that your signature?

14   A.  No.

15   Q.  How do you know?

16   A.  Because I don't sign like that, and it's even not written

17   correctly.

18   Q.  When you say it's not written correctly, what do you mean?

19   A.  There's an R missing, it "Robeto."

20   Q.  Do you ever sign your name without the second R?

21   A.  No.

22   Q.  Did you get any holidays off during the time that you

23   worked for the parking lot?

24   A.  No.

25   Q.  Did you ever meet Roberto Vasquez, Gloria's husband?

I2QPHERT                          Herrera – Direct

1   A.  Yes.

2   Q.  Okay.  And when you met him, did you speak with him at all?

3   A.  Yes.

4   Q.  What did he say to you, and what did you say to him?

5   A.  He arrived.  I was like attending a client.  He came in the

6   room:  Hi, I'm Roberto.  I'm Gloria's husband.  And he walked

7   through the parking, and then he came back and left.  And soon

8   after, he returned, like three days after, and then he left.

9            THE COURT:  Mr. Lucas, do you have much more?

10           MR. LUCAS:  No.  We're almost finished, your Honor.

11           THE COURT:  Okay.

12  Q.  Mr. Herrera, when this case was filed, did the complaint

13  have an error in the start date of your employment?

14  A.  Well, maybe it was with the translation.

15  Q.  Were you ever completely relieved from duty during your

16  12-hour shifts, apart from the few occasions when Fernando

17  Guerrero covered for you?

18  A.  No.

19  Q.  Did you ever get paid by check?

20  A.  Never.

21           MR. LUCAS:  Okay.  No further questions, your Honor.

22           THE COURT:  Let's take our break, 15 minutes.  So it's

23  ten after the hour.  Please be on time so we can get started

24  right away.

25           MR. LUCAS:  Yes, your Honor.

I2QPHERT                          Herrera - Cross

1          THE COURT:  And please have your subsequent witnesses

2    ready to go.  All right?  Ten minutes after the hour, and I

3    start right on time.

4          (Recess)

5          THE COURT:  Okay.  You can be seated.  Mr. Samuel, are

6    you ready to proceed?

7          MR. SAMUEL:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MR. SAMUEL:

10   Q.  Good morning, Mr. Herrera.

11   A.  Good morning.

12   Q.  I would like to show you --

13         MR. SAMUEL:  I would like to get the complaint marked

14   as Defendant's Exhibit 1.

15         THE COURT:  Very well.

16   Q.  Mr. Herrera, let me show you what's been marked as

17   Defendant's Exhibit 1.  Can you please take a look at that

18   document and tell me if you've ever seen it before?

19   A.  No.

20   Q.  Do you know what that document is?

21   A.  No.

22   Q.  Does it have your name on it?

23   A.  But I don't know English.

24   Q.  Did your lawyer ever show you any pleadings that were filed

25   in this case?

I2QPHERT                    Herrera - Cross

1   A.  I don't remember.  I think, yes, but in Spanish.

2   Q.  What was it in Spanish that you were shown?

3   A.  In the beginning of the case, they showed me something, but

4   I don't know if it's the same thing.

5   Q.  And the document that you were shown, what did that

6   document say?

7   A.  I read it at the beginning.  I don't remember.

8   Q.  Did you sign the document?

9   A.  I think so.

10  Q.  Do you have a copy of the document?

11  A.  No.

12  Q.  Okay.  If you can please take a look at --

13  A.  This is in English.  I won't be able to tell you.

14  Q.  Okay.  Well, in the complaint that your attorney filed in

15  this case, it says that you started working in February of

16  2014.

17  A.  There must have been a mistake.

18  Q.  Well, what kind of a mistake was it?

19  A.  Because I started working -- I entered work 2015.

20  Q.  And do you know why the complaint says you started in

21  February of 2014?

22  A.  It could have been that in the translation.

23  Q.  When you say translation, what do you mean?

24  A.  Maybe when they translated from Spanish to English, the

25  person that did it could have made a mistake.

I2QPHERT                          Herrera – Cross

1    Q.   So that's not accurate; is that fair to say?

2    A.   To say 2014 is not correct.  Correct is 2015.

3    Q.   But, sir, the complaint says you did start in 2014, and you

4    would admit that that's inaccurate?

5    A.   That is incorrect.

6    Q.   Now, sir, in the complaint, it says you worked there seven

7    days a week, 12 hours a day?

8    A.   Repeat?

9    Q.   In the complaint it says you worked seven days a week, 12

10   hours per day?

11   A.   Yes.

12   Q.   And that's how you testified here today, that those were

13   your hours?

14   A.   That's what I said.

15   Q.   And in your complaint it doesn't mention about the fact

16   that you went to the Dominican Republic for three weeks, does

17   it?

18            MR. LUCAS:  Objection to form.  Misstates the

19   testimony.

20            THE COURT:  Overruled.  You can answer.

21   A.   Yes, I went to Dominican Republic but –- yes, I went to

22   Dominican Republic.

23   Q.   Right.  And your counsel is correct, I think you said it

24   was about 15 days?

25   A.   Yes.

I2QPHERT                    Herrera - Cross

Q.  But your complaint does not reference the fact that you
were out of the country for 15 days that you claim to have been
working?

A.  But, yes, I did leave the country for 15 days,
November 10th and came back November 25th.

Q.  All right.  I'm not disputing the fact that you went out of
the country.  My point is that the complaint doesn't say that
you went out of the country for 15 days?

A.  That could have been a mistake of the translator.

Q.  Well, did you tell the translator that you went out of the
country for 15 days in 2015?

A.  Maybe they didn't ask me that.

Q.  Well, didn't you think it was important that you mention
the fact that you were out of the country when you claim to
have been working?

A.  I didn't know it was important.  I didn't know I had to say
that.

Q.  Well, sir, you're coming to court today, trying to get
money out of the defendants for overtime pay and minimum wage
pay, don't you think it's important to be accurate as to the
hours that you worked?

A.  I didn't know that -- that's correct, but they didn't ask
me if I had left the country.  At no point I have denied that I
didn't leave the country.

Q.  But you never mentioned it in the complaint?

I2QPHERT                    Herrera - Cross

1    A.  They didn't ask me.

2    Q.  Now, sir, earlier today you testified that you received

3    $490 per week?

4    A.  Yes.

5    Q.  But in your complaint, you say that you received an hourly

6    pay of $5.90 per hour.  So, sir, what's correct, did you get

7    paid $490 per week, or did you get paid $5.90 per week?

8    A.  490 per week.

9    Q.  But, sir, if I can direct your attention to paragraph 47 of

10   the complaint, it says there not that you got paid 490 per

11   week, it says you got paid 5.90 per hour.  So is that also

12   inaccurate?

13   A.  I would just receive 490 per week.

14   Q.  Now, sir, earlier you said that somebody by the name of

15   Fernando would occasionally cover some of your time that you

16   were supposed to be working.  Did you ever tell Gloria about

17   that?

18   A.  Yes.  She said I'm the one responsible of anything that

19   regarding to your shift, what you have, the shift you have.

20   Q.  So let's talk about the time before you went to the

21   Dominican Republic.  How often would Fernando cover your

22   shifts?

23   A.  Very little.  Maybe, at that time, four or five times for

24   an hour or two.  So I went to vacation, he covered those 15

25   days.  When I came back, I continued my shifts.  So soon after

 1  is when she didn't want Fernando at work because the brother of

 2  Fernando supposedly had worked already, and they had had a

 3  problem with him.  That's what she told me.

 4      That's when -- soon after that's when I looked for

 5  Alvaro because I was feeling exhausted from working those seven

 6  days.  That's when they did one day to me and one day to Julio.

 7  As soon as I leave, she leaves Fernando because Julio called

 8  the other guy and told him not to return anymore.

 9  Q.  Okay.  So when you returned from the Dominican Republic,

10  you testified Alvaro Vargas worked one of your shifts and

11  Julio's shift?

12      THE INTERPRETER:  I'm sorry, I can't hear because of

13  the noise.

14      THE COURT:  We called the outside, but we'll get it

15  taken care of in a minute.

16      THE INTERPRETER:  Can you repeat that?

17  BY MR. SAMUEL:

18  Q.  Sir, you testified when you returned from the Dominican

19  Republic, Alvaro took one of your shifts and one of Julio's

20  shifts?

21      THE INTERPRETER:  Took what from his shift?

22      MR. SAMUEL:  One of his shifts and one of Julio's

23  shifts.

24      THE INTERPRETER:  Just repeat.  I'm sorry.

25  BY MR. SAMUEL:

1  Q.  You testified that when you returned from the Dominican

2  Republic, Alvaro Vargas took over one of your shifts and one of

3  Julio's shifts?

4              MR. LUCAS:  Objection to form.  I believe that

5  misstates the testimony.

6              THE COURT:  Overruled.

7  A.  Not when I arrived.  It was further ahead, like more or

8  less like December, more or less from then on that Alvaro

9  started covering the shifts.

10  Q.  That's my mistake.  It wasn't immediately after this

11  Dominican Republic, but maybe a month later Alvaro started

12  doing one of your shifts and one of Julio's shifts; is that

13  your testimony?

14  A.  Can you repeat that?

15  Q.  At some point after you returned from the Dominican

16  Republic, you testified that Alvaro took over one of your

17  shifts?

18  A.  Yes, but I came in November.

19  Q.  I understand that.

20  A.  And Alvaro started, I think -- like from December on Alvaro

21  started do one day for me and one day for Julio.

22  Q.  Okay.  Now, when you filed your complaint in this court,

23  did you mention anything about the fact that Alvaro Vargas took

24  over one of your shifts in around December of 2015?  And you

25  can use the translator to look through the complaint.

I2QPHERT                    Herrera - Cross

1   A.  They didn't ask me.

2   Q.  But when you filed your complaint, you said that you worked

3   seven days a week, 12 hours per day?

4   A.  Yes.

5   Q.  But that wasn't accurate after December of '15, correct?

6   Because you only worked six days and not seven days?

7   A.  I worked six days after I came from Dominican Republic.

8   Q.  Sir, I understand that, but your complaint doesn't say

9   that.  Your complaint says you worked seven days a week, from

10  8:00 a.m. to 8:00 p.m.  So is the complaint not accurate as to

11  that?

12  A.  The complaint is correct.  What I'm rectifying is that at

13  the time that -- the time he covered because at the time I was

14  exhausted from working.

15  Q.  But, sir, the complaint is not correct because it says you

16  worked seven days a week for the whole time that you worked

17  there?

18  A.  I worked seven days of the week, again, and I repeat.  And

19  then after coming from Dominican Republic, that's when I'm

20  exhausted from working seven days, 12 hours, seven days a week,

21  that's when Gloria allowed me one day and one day Julio, and

22  Alvaro would do it.

23  Q.  We'll move on.  Now, your complaint doesn't mention

24  Fernando either, the fact that you used Fernando to cover some

25  of your time that you were supposed to be working, correct?

1          THE INTERPRETER:  I'm sorry, I missed the beginning.

2    Q.  The complaint doesn't mention that you used Fernando to

3    cover some of the time that you were supposed to be working,

4    correct?

5    A.  I can't tell you about the complaint.  I was just given a

6    copy in Spanish.

7    Q.  Was it a copy of the complaint?

8    A.  I don't remember if it was a copy.  All I know is the

9    lawyer handed to me a copy of a document in Spanish.

10   Q.  Okay.  And you're not sure if you signed it or not?

11   A.  Yes.  Yes, I think I remember signing to give the case to

12   the lawyer to take it forward.

13   Q.  Now, on direct, you testified that you didn't know if

14   Gloria Genao's sons ever worked in the parking lot; is that

15   correct?

16   A.  She's never worked the time I was there.

17   Q.  Well, sir, when you weren't at work, you don't know if

18   Gloria worked or not; is that correct?

19   A.  At the time that I was, she never worked, just Julio and me

20   would work, two shifts.

21   Q.  Did Fernando know what shift you worked?

22   A.  Of course, yes.

23   Q.  Are you aware that Fernando testified your shift was only

24   seven hours?

25   A.  Eight hours, not seven.  12 hours, not seven, nor eight.

I2QPHERT                         Herrera - Cross

 1  It was 12 hours, and he knows that and everybody knows that.

 2  Q.  But, sir, Fernando testified this morning and said your

 3  shift was only seven hours and five days per week?

 4  A.  So he's lying.  Anyone that says that we work less than 12

 5  hours are lying.

 6  Q.  Now, sir, when you went to the Dominican Republic, did

 7  Ms. Genao give you a loan of some amount of money?

 8  A.  Yes.  $500.

 9  Q.  And how did she give you that money?

10  A.  She sent it to me.

11  Q.  Okay.  And did you ever repay that money?

12  A.  Of course, yes.

13  Q.  And when did you repay the money?

14  A.  Every week that I get paid, I would give her $100.

15  Q.  So as soon as you returned, you repaid her $100 per week?

16  A.  Yes.

17  Q.  Did you get any type of receipt?

18  A.  100 and 150.

19  Q.  Now, I believe on direct testimony you testified that

20  Ms. Genao sold you a car?

21  A.  Yes.

22  Q.  And I believe you said that was a few months before you

23  left for the Dominican Republic?

24  A.  I already had my car.  You're asking me if I had my car

25  before going or after?

I2QPHERT                          Herrera - Cross

1   Q.  Did you have --

2   A.  Now, you ask me and I answered that.  Yes, I had the car,

3   yes, before going to Santo Domingo.

4   Q.  And when you say the car, you're referring to the car that

5   Ms. Genao sold you?

6   A.  Yes.  Ford Fusion, which had been crashed and was damaged.

7   So I really asked for her to bring down the -- because it was

8   damaged, and she said no; so I paid $1,800.

9   Q.  And when did you pay her the 1800?

10  A.  2,800.

11  Q.  Did you pay her in one shot, or did you pay her out over

12  time?

13  A.  No.  Every time I got paid, I would pay 100, 150, and then

14  when I'm done paying, then she gave me the title.  She never

15  wanted to give it to me until I finished paying it.

16  Q.  And did she eventually give you the title to the car?

17  A.  Yes.  Right after I paid her, finished paying her.

18  Q.  Do you recall what month it was that you finished paying

19  her for the car?

20  A.  No, not exactly because I didn't know that I'd have to

21  remember such things.

22  Q.  Well, sir --

23  A.  It's the only car I have had.

24  Q.  What month was it that you said that you got the car?

25  A.  Yes, I think the first month I started working, she started

1    to discount that money off.

2    Q.  You said you started working in January of 2015?

3    A.  Yes.

4    Q.  Was that when you got the car from Ms. Genao?

5    A.  Yes.

6    Q.  Now, sir, when you weren't at the lot, you wouldn't really

7    know who was working, correct?

8    A.  You mean when I was on vacation?

9    Q.  No, no.  During the times between 8:00 a.m. and 8:00 p.m.

10   when you said you worked?

11   A.  8:00 a.m. to 8:00 p.m.

12   Q.  Is it possible Kendrick worked, but you just didn't know

13   about it?

14   A.  That who was working?

15   Q.  Ms. Genao's son?

16   A.  No.  He did not work.  Julio would follow me, and I

17   followed Julio, illegal, no documents.  He has no documents,

18   and he's still working.

19   Q.  Who is still working?  Oh, Julio?

20   A.  They tell me Julio continues working.

21   Q.  Sir, is it possible Gloria or her sons worked at the lot

22   and you just didn't know it because you weren't there 24/7?

23   A.  Yes, I worked 24 hours in the day -- 12 hours in the day,

24   12 hours in the day.  You're trying to confuse me.  Julio would

25   work 12 hours and I 12 hours.  I would follow him.  He would

1   follow me; so I asked him myself at what time could he have

2   worked?

3   Q.  Well, sir, my only point is during the times that you were

4   not at the lot, isn't it possible that Gloria or her sons

5   worked and you just and/or her sons worked and you just didn't

6   know it?

7   A.  No, no, it's not possible because when it was one hour or

8   two hours, it was Fernando, because he lives right there.

9               THE COURT:  I think we've covered this area

10  sufficiently.

11              MR. SAMUEL:  I have no further questions.

12              THE COURT:  Any redirect?

13              MR. LUCAS:  Very brief, your Honor.

14  REDIRECT EXAMINATION

15  BY MR. LUCAS:

16  Q.  Mr. Herrera, are you positive that you got the car from

17  Gloria in January 2015?

18  A.  I got it -- I mean, she didn't give me the car, but the car

19  was mine.  Apart that it was crashed, she didn't allow me to

20  move it until I finished paying her her money.  It was mine,

21  but the car was there.

22              MR. LUCAS:  No further questions.

23              THE COURT:  Okay.  Sir, you may step down.

24              (Witness excused)

25              MR. LUCAS:  May I duck into the hallway, your Honor,

1    to get the next witness?

2            THE COURT:  Please do.  And will Mr. Herrera be

3    sitting with you at counsel table?

4            MR. LUCAS:  If that's okay with the Court.

5            THE COURT:  Certainly.  Sir, you can be seated.

6            Who are you calling, Mr. Lucas?

7            MR. LUCAS:  Jaimie Rijo-Contreras, and this witness

8    speaks English; so I don't think we'll need an interpreter.

9            THE COURT:  Please step up and step into the witness

10   box and remain standing.  There may be wires on the floor.

11           THE WITNESS:  Here?

12           THE COURT:  Yes.

13   JAMIE RIJO-CONTRERAS,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16           THE COURT:  Okay.  You may be seated, and bring your

17   chair up and speak directly into the microphone.

18           If you could, please, begin, sir, by stating your full

19   name and spelling your last name for the record.

20           THE WITNESS:  My name is Jaime Alexander

21   Rijo-Contreras.  Last name is spelled R-i-j-o, hyphen,

22   C-o-n-t-r-e-r-a-s.

23           THE COURT:  Very good.  Mr. Lucas.

24   DIRECT EXAMINATION

25   BY MR. LUCAS:

1    Q.  May I call you Mr. Contreras, or would that be incorrect?

2    A.  You can call me Contreras.

3    Q.  Okay.  Sir, what is your occupation?

4    A.  I'm a taxi.

5    Q.  You drive a car?

6    A.  Yes, a taxi for TLC or Uber.

7    Q.  Okay.  How long has that been your occupation?

8    A.  About five years.

9    Q.  Okay.  And what is your educational background, very

10   briefly?

11   A.  Currently, at Hostos Community College, graduating, getting

12   an Associate's degree in business management.  That's what I

13   have right now.

14   Q.  Okay.  All right.  What was your occupation in 2015?

15   A.  I was also a taxi then.

16   Q.  Okay.  Did there come a time when you became acquainted

17   with the plaintiff, Roberto Herrera?

18   A.  Yes.

19   Q.  When was that?

20   A.  When I would bring my car and pick up my car.

21   Q.  What year was that?

22   A.  '15 and '16.

23   Q.  Okay.  And did you bring your car from time to time to the

24   parking lot where Mr. Herrera worked?

25   A.  I would bring my car seven to six days a week.

1    Q.  Six to seven days a week, you would bring your car there?

2    A.  Yes.

3    Q.  And did you park it there six to seven days a week?

4    A.  Yes.

5    Q.  Did you ever drop your car off at 8:00 in the morning at

6    that parking lot?

7    A.  No, I would pick up my car around that time --

8    Q.  Okay.

9    A.  -- to start my day.

10    Q.  And when you picked up your car at 8:00 in the morning,

11    who, if anyone, helped retrieve your car for you?

12    A.  It was always Robert.

13    Q.  Okay.  And were there any times where you either dropped

14    off or picked up your car between 3:00 and 8:00 p.m.?

15    A.  Usually that would be on the weekends, when I would take a

16    long night shift, but Monday through Thursday I would always

17    pick up my car between 7:30 and 8:30 in the morning, and I

18    would bring it back between 8:00 and 9:00 at night.  I would do

19    a 12-hour shift, sometimes 10, throughout the day working.

20    Q.  Okay.  And when you brought your car back at 8:00 at night,

21    who, if anyone, took your car at the lot?

22    A.  It would be Robert.

23    Q.  Okay.  The times you mentioned, I think you said weekends

24    or something, periodically it would be between 3:00 and

25    8:00 p.m. when you would go to the lot?

1    A.  Yes, to work in the overnight shift because of the scenery.

2    Q.  And when you --

3            THE COURT:  I'm sorry, because of the?

4            THE WITNESS:  Like the nightlife on the weekends,

5    that's where taxi makes more of their money.  They can help

6    people taking them to restaurants, the movie and clubs.

7            THE COURT:  So you worked later hours on the weekend?

8            THE WITNESS:  Yes, just weekends.

9            THE COURT:  By the way, while we're at it, the lot

10   that you saw him at, where was that lot located?

11           THE WITNESS:  I believe the lot was on -- I know it

12   was over by Southern Boulevard and 181st.  I think the street

13   was Crotona Parkway.  I can't remember exactly, but it was

14   really close to the Bronx Zoo, right next to 180th.  I think it

15   was on 181st.

16           THE COURT:  Thank you.

17   BY MR. LUCAS:

18   Q.  Okay.  Does the address 850 East 181st Street ring a bell?

19   A.  Yes, it sounds like that's what the lot was.

20   Q.  On those occasions when you went to the lot between 3:00

21   and 8:00 p.m. on weekends, who, if anyone, handled your car?

22   A.  It would be Robert.

23   Q.  And on those occasions when you were at the lot after

24   8:00 p.m. but before 8:00 a.m., who handled your car?

25   A.  Sometimes it would be Robert, and sometimes it would be

I2QPHERT                    Rijo-Contreras

1   another individual that runs the night shift.  I think his name

2   is Julio.  I'm not exactly sure that's his name.

3   Q.  On those occasions when it would be Robert, would it be

4   relatively close in time to the 8:00 a.m. or 8:00 p.m. mark?

5   A.  Sometimes it would be like around 9:00, 10:00, and I would

6   see Robert and not the other person.

7           MR. LUCAS:  No further questions.

8           THE COURT:  Cross, Mr. Samuels?

9   CROSS-EXAMINATION

10  BY MR. SAMUEL:

11  Q.  Good morning, Mr. Contreras.

12  A.  Hello, good morning.

13  Q.  Have you ever spoken to Mr. Herrera about this lawsuit?

14  A.  No.  He actually mentioned it to me not too long ago.  I

15  didn't know this was going on until he decided to let me know

16  this was going on about the lawsuit.  He mentioned it to me.  I

17  just came here as a witness.

18  Q.  And when for the first time did he mention to you that

19  there was the lawsuit over claims that he was owed money?

20  A.  I think when he mentioned it to me, I think was about a

21  month, a month or two ago, 60 days, roughly.

22  Q.  And prior to that, did you know that there was a lawsuit

23  going on?

24  A.  Nope.  I had no idea.

25  Q.  Okay.  Did you ever speak to Mr. Herrera's lawyer about

1   this case?

2   A.   This is the first time I'm actually meeting him.  I just

3   received a letter about two weeks ago, something roughly like

4   that, letting me know that I'm to come here; so that's what I

5   did.

6   Q.   Prior to a month ago, you didn't know anything about this?

7   A.   I didn't really know much of it.  It was just brought up to

8   me by Robert, and that's about it.

9   Q.   When you say you didn't know much of it, did you know

10  anything about the lawsuit prior to a month ago?

11  A.   Nope, I had no idea.

12  Q.   Sir, are you aware that your name was given as a witness to

13  this case probably about six months ago?

14  A.   If I was aware, not really.

15  Q.   Well, Mr. Herrera's lawyer filed a document called a rule

16  26, and your name was listed as a witness on that document.  Do

17  you know anything about that?

18  A.   No, I was not aware of this, but, if anything, I'm glad he

19  did because I was there.

20  Q.   But would you be surprised that six months ago, your name

21  was given as a witness, but you didn't know anything about the

22  lawsuit until about a month ago?

23  A.   Not really.  I wouldn't be surprised.

24  Q.   Okay.  Are you friends with Mr. Herrera?

25  A.   Actually, we became really good friends.

I2QPHERT                    Rijo-Contreras

1   Q.  And how long ago was that?

2   A.  When he was -- I met him where he was working, at the

3   parking lot.

4   Q.  Now, aside from Roberto and Julio, did you ever notice any

5   other parking lot attendants at that lot?

6   A.  Just when Julio would be the nighttime, and there was this

7   one guy, I can't remember his name, but I actually met him

8   today, he's outside, where I would see him probably like once

9   or twice, probably three times, at most, throughout the whole

10  entire month.

11  Q.  And was that person working at the lot when you saw him?

12  A.  When I saw him, he was working.

13  Q.  Do you know who the owner of the lot is?

14  A.  I have no idea.

15  Q.  Now, do you know if, during the day, Mr. Herrera took any

16  breaks?  Would you know that or not?

17  A.  Not really.  I wouldn't know.

18  Q.  And was there ever a period of time when Mr. Herrera wasn't

19  at the lot when you expected him to be at the lot?

20  A.  Only when I would see the other person that is outside.

21  Q.  Okay.

22  A.  He was there all the time.

23  Q.  And did you park your car in the lot in or around October

24  of 2015?

25  A.  I believe so.

1    Q.  And do you recall Mr. Herrera being there the whole month

2    during October 2015?

3    A.  I believe so.

4    Q.  So there were no breaks during that month?

5    A.  Like I said, I just parked my car there.

6           MR. SAMUEL:  Okay.  No further questions.

7           THE COURT:  Any redirect?

8           MR. LUCAS:  Brief.

9    REDIRECT EXAMINATION

10   BY MR. LUCAS:

11   Q.  Mr. Contreras, have you ever socialized with Roberto

12   Herrera outside of work?

13   A.  Not really.

14   Q.  Well --

15   A.  I would say throughout the whole entire time I've known

16   him, there was just one time I randomly saw him, like around

17   2:00 in the morning at a bar that I went to.  Only, that was

18   just like once, once or twice.  One other time was just

19   coincidence in the streets.

20   Q.  Okay.  Did you receive a subpoena compelling your

21   appearance here today?

22   A.  Subpoena?  Anything that I have is the paper that I

23   received in the mail.

24   Q.  Okay.  Did you volunteer to be here today before receiving

25   that piece of paper?

1  A.  When Robert had mentioned it to me, I told him, yes, no

2  problem, I will come here.

3  Q.  You mentioned that you saw one of the people out in the

4  hall at the parking lot a maximum of one to three times a

5  month; is that correct?

6  A.  Yes.

7  Q.  Was that every month in 2015?

8  A.  I would say the most I seen him, I would say two months, at

9  most, just like a total of probably six or four times.

10 Q.  Four to six times total?

11 A.  Total.  That's what I can remember.

12 Q.  And was that person parking cars when you saw him?

13 A.  Yes.

14 Q.  And when you saw that person, was it after 8:00 p.m. or

15 before 8:00 p.m.?

16 A.  Before.

17 Q.  Each time it was before 8:00 p.m.?

18 A.  Yes.  Just one time I think I saw him like around 9:00 or

19 10:00.

20 Q.  Okay.  All right.  And do you recall what month you saw him

21 four to six times, or what two-month period you saw him four to

22 six times?

23 A.  I can't remember.

24 Q.  Okay.  And do you remember what year you saw him four to

25 six times?

1   A.  I think 2015 and 2016, one of those two years.

2   Q.  Say those two years again?

3   A.  2015 and 2016, it would have to be in that time frame.

4   Q.  Do you know if any of the times in 2016 were after

5   February 2016?

6   A.  I can't recall.

7               MR. LUCAS:  Okay.  No further questions.

8               THE COURT:  Mr. Samuel?

9               MR. SAMUEL:  Nothing from defense.

10              THE COURT:  Mr. Contreras, you may step down.

11              THE WITNESS:  Okay.

12              (Witness excused)

13              THE COURT:  Your next witness?

14              MR. LUCAS:  Can I grab the next witness?

15              THE COURT:  Yes.  By the way, I just want to mention

16   to counsel, no exhibits have been received in evidence.

17              MR. LUCAS:  Yes, so I think -- I'm glad you raised

18   that, your Honor.  Defense counsel and I have agreed to

19   stipulate each other's exhibits into evidence.

20              MR. SAMUEL:  That's correct.

21              THE COURT:  Very well.  You may step down.

22              THE WITNESS:  Okay.

23              THE COURT:  Mr. Lucas, please call your next witness.

24              MR. LUCAS:  Plaintiffs call Melissa Rodriguez to the

25   stand.

I2QPHERT                        Rodriguez - Direct

1          THE COURT:  Ms. Rodriguez, please step up.  Right up

2    this way, please.  Watch your step, and you're going to step up

3    into the witness box and remain standing.

4          MR. LUCAS:  She doesn't need an interpreter.  Thank

5    you.

6    MELISSA RODRIGUEZ,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9          THE COURT:  You may be seated.  Please be careful.

10   Pull the chair up to the microphone.  Please speak directly

11   into the microphone, and if you could begin by stating your

12   full name and spelling your last name for the record.

13         THE WITNESS:  My name is Melissa Rodriguez.  The

14   spelling is R-o-d-r-i-g-u-e-z.

15         THE COURT:  Thank you.  Mr. Lucas.

16         MR. LUCAS:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MR. LUCAS:

19   Q.  Ms. Rodriguez, did there come a time when you became

20   acquainted with the plaintiff, Roberto Herrera?

21   A.  Yes.

22   Q.  When was that?

23   A.  May 2015.

24   Q.  Okay.  And what was the nature of your relationship with

25   Mr. Herrera?

1    A.  Just that I started parking at Star Parking lot, and

2    Mr. Herrera was the one who would enter my car into the parking

3    lot and park it there.

4    Q.  How often did you park there?

5    A.  Every day.

6    Q.  What time?

7    A.  It would vary.  There's times that I would come in at -- I

8    would leave at 8:00 in the morning, and times that I would come

9    in to park my car at 8:00 at night or 9:00 at night, 7:00,

10   depending.

11   Q.  Okay.  Did you ever see someone named Julio working in the

12   parking lot?

13   A.  Yes.

14   Q.  Okay.  Do you know when Julio worked?

15   A.  Julio would work from 8:00 -- from 8:00, I believe,

16   until -- 8:00 at night, 8:00 p.m. until 8:00 p.m. the next day.

17   But sometimes I think I would see him earlier, before 8:00.  He

18   would come in like around 7:00 because that's the busiest times

19   with the parking.

20   Q.  Do you know when Roberto Herrera worked in the parking lot?

21   A.  From 8:00 a.m. to 8:00 p.m. but there was times that he

22   would stay a little extra because at night, when the cars would

23   come in, it was a lot of traffic; so Julio and Roberto would

24   have to work together.

25   Q.  Did you live, at that time, in relation to the parking lot

I2QPHERT                          Rodriguez - Direct

1    where Mr. Herrera worked?

2    A.   Across the street.

3    Q.   Did there come a time when you and Mr. Herrera started

4    dating?

5    A.   Yes.

6    Q.   When was that?

7    A.   June 2015.

8    Q.   Did there come a time when Mr. Herrera moved into your

9    apartment?

10   A.   Yes.

11   Q.   When was that?

12   A.   July 2015.

13   Q.   Okay.  And how long did Mr. Herrera live at your apartment?

14   A.   Until February 2016.

15   Q.   During the time that Mr. Herrera lived at your apartment,

16   did you ever go to the parking lot, other than a reason than to

17   park your car?

18   A.   Yes.

19   Q.   When and how long?

20   A.   Almost every day, and it was to bring him his breakfast and

21   to bring him his lunch.

22   Q.   Are you acquainted with the defendant, Gloria Genao?

23   A.   I've seen her twice.

24   Q.   Did you ever see her parking cars at the parking lot?

25   A.   Never.

I2QPHERT                         Rodriguez - Direct

1   Q.   Did you ever see anyone other -- strike that.

2                Between January 2015 -- strike that.

3                Between May 2015, when you started parking at the lot,

4   and February 2016, did you ever see anyone other than Roberto

5   or Julio parking cars?

6   A.   I believe I've seen Alvaro Vega working.

7   Q.   How many times?

8   A.   Not much, not much.  Maybe once or twice a week.  But that

9   was around February, I believe, or January.

10  Q.   Okay.  Anyone else besides Alvaro Vega?

11  A.   No.

12  Q.   What about a gentleman named Fernando Guerrero, did you

13  ever see that person?

14  A.   Yes.

15  Q.   Okay.  How many times did you see him?

16  A.   I would see him -- I saw him during, I believe, January or

17  February -- I'm not too sure, but I believe it was January, or

18  it could have been November, I'm not too sure, in which he was

19  training for Herrera's vacation.

20  Q.   Okay.

21  A.   And to cover for Julio, who got sick.

22  Q.   Did there come a time when you had Roberto Herrera arrested

23  at work?

24  A.   Yes.

25  Q.   When was that?

I2QPHERT                          Rodriguez – Cross

1   A.  February 2016.

2   Q.  And did you subsequently withdraw the charges?

3   A.  Yes.

4           MR. LUCAS:  No further questions.

5           THE COURT:  Cross-examination?

6   CROSS-EXAMINATION

7   BY MR. SAMUEL:

8   Q.  Good afternoon, Ms. Rodriguez.

9   A.  Good afternoon.

10  Q.  Are you still together with Mr. Herrera?

11  A.  No.

12  Q.  When was the first time you found out about this lawsuit?

13  A.  This was after I had my child I found out.

14  Q.  When did you have your child?

15  A.  In March.

16  Q.  In March of?

17  A.  2016.

18  Q.  Okay.  And at that time, you found out that Mr. Herrera was

19  bringing the lawsuit?

20  A.  Around that time is when I found out, when my son was born.

21  So I don't know if it was in May or in April that I found out

22  that he was having the lawsuit against Gloria.

23  Q.  And what did he tell you about the lawsuit?

24  A.  He told me what happened, that, you know, she wasn't paying

25  him correctly for all those hours he was working, he was only

I2QPHERT                    Rodriguez - Cross

1   getting paid $70 a day, and he also mentioned that she

2   falsificated (ph) insurance fraud and she stated that he hit a

3   car, you know, which he didn't.

4   Q.  Do you have any direct knowledge of that, or is that

5   just --

6   A.  Yes, because the same day that she stated that he hit the

7   car was the same day that I got him arrested, and I went to the

8   parking lot and I personally showed the cop who was Roberto

9   Herrera.  I ID'd Roberto Herrera, and they took him that

10  morning.

11  Q.  But do you know who reported -- do you know what Ms. Genao

12  reported to the police?

13  A.  I do not know.

14  Q.  You just said a moment ago that she falsified some -- she

15  fabricated something?

16  A.  Well, according to what Roberto had mentioned to me --

17  Q.  I'm just asking what you know, not what Roberto knows.

18  A.  What I know is the same thing that Robert had mentioned to

19  me, that she was --

20  Q.  Not what Robert said.  I want to know directly what you

21  know.

22  A.  Well, then I don't know.

23  Q.  Okay.  You said earlier that you brought him his breakfast

24  and lunch?

25  A.  Yes.

1   Q.  Did you ever go there after 2:00 in the afternoon, to the

2   lot?

3   A.  Yes.

4   Q.  And you never saw Gloria Genao working at the lot?

5   A.  Never.

6   Q.  And you never saw her two sons working at the lot?

7   A.  Never.

8   Q.  Okay.  And you said earlier that the only attendants that

9   you saw working at the lot were Julio, Roberto and after

10  Roberto got back from the Dominican Republic, you saw Fernando

11  and Alvaro working; is that correct?

12  A.  I seen -- the only employees I've seen was Julio, Fernando,

13  Roberto and Alvaro.  Those are the only -- I haven't seen

14  Gloria's sons, and I've never seen Gloria.  I seen -- out

15  parking cars.  I've seen her in a meeting with her employees,

16  which was Julio and Roberto, but I've never seen her park any

17  cars.

18  Q.  And you're aware, I'm sure because he was living with you

19  at the time, that Fernando went to the Dominican Republic in

20  October of 2015, correct?

21        MR. LUCAS:  Objection.  He said Fernando.  I think you

22  meant Roberto, and you said October --

23        THE COURT:  Why don't we rephrase the question,

24  Mr. Samuel.

25  Q.  Okay.  Roberto Herrera went to the Dominican Republic at

I2QPHERT                      Rodriguez - Cross

1    the end of 2015, correct?

2    A.  At the end of or October?

3    Q.  At the end.

4    A.  At the end of 2015?

5    Q.  Yes.

6    A.  I believe so, yes.

7    Q.  So, obviously, he wasn't working in the lot at that time.

8    So who was covering his shift?

9    A.  I believe the person that was covering his shift was

10   Fernando.  I'm not too sure.

11   Q.  So you don't know.

12           MR. SAMUEL:  Okay.  I have nothing further.

13           THE COURT:  Any redirect?

14           MR. LUCAS:  No redirect, your Honor.

15           THE COURT:  Ms. Rodriguez, you may step down.  Thank

16   you.

17           (Witness excused)

18           MR. LUCAS:  May I get the next witness, your Honor?

19           THE COURT:  Yes, please.  And, Mr. Lucas, who are you

20   calling?

21           MR. LUCAS:  Plaintiff calls Alvaro Vargas.

22           THE COURT:  Sir, please step forward.  Step up into

23   the witness box right here next to me and remain standing.

24   ALVARO VARGAS,

25       called as a witness by the Plaintiff,

1          having been duly sworn, testified as follows:

2                    THE COURT:  You may be seated.  Please pull your seat

3     up to the microphone and please, sir.  Begin, if you would, by

4     stating your full name and spelling your last name.

5                    THE WITNESS:  Alvaro Manuel Vargas Montero.

6                    THE COURT:  Mr. Lucas.

7     DIRECT EXAMINATION

8     BY MR. LUCAS:

9     Q.  Mr. Vargas, did there come a time when you became

10    acquainted with the plaintiff, Roberto Herrera?

11    A.  I met him, the parking where he works.

12    Q.  Okay.  When was that?

13    A.  That was December 2015.

14    Q.  Okay.  And did there come a time when Mr. Herrera discussed

15    the possibility of you working part time as a parking lot

16    attendant?

17    A.  Correct.  I would cover his days off.  When I arrived

18    there, he didn't have a day off.  He was working seven days.

19    Q.  Did there come a time when you started working as a parking

20    lot attendant at that parking lot where Mr. Herrera worked?

21    A.  I would park the cars there.

22    Q.  How often?

23    A.  I would cover two days off, one of the day and the other

24    one was in the evening.

25    Q.  And the day shift was from when to when?

1   A.  Like I said, when I met him, a few days in December I

2   started, until February.

3   Q.  Okay.  And when you covered a day shift, what time did you

4   show up for work?

5   A.  From 8:00 in the morning until 8:00 in the evening.

6   Q.  Okay.  And when you covered a night shift, when did you

7   show up for work?

8   A.  From 8:00 in the evening to 8:00 in the morning.  It was 12

9   hours.

10  Q.  When you covered a day shift, who were you covering for?

11  A.  For Mr. Robert.

12  Q.  When you covered a night shift, who were you covering for?

13  A.  Well, the young one called Julio.  It's a South American.

14  Q.  Okay.  And how much did you get paid for covering

15  somebody's shift?

16  A.  70 bucks.

17  Q.  And how did you get paid that 70 bucks?

18  A.  Cash.

19  Q.  From who?

20  A.  He sometimes paid, and sometimes the night shift, sometimes

21  him.

22  Q.  Did you ever see any family member of Gloria Genao parking

23  cars at the parking lot?

24  A.  Never, never all the time that I've been there.  I never

25  saw them parking a car.

I2QPHERT                    Vargas - Cross

1   Q.  Did you ever meet Gloria Genao?

2   A.  Yes, I met her because she -- yes, I met her because she

3   would -- she would come in her vehicle.  She would come and get

4   the report of what had been done.  The report that I was

5   getting from the parking, I would hand it to her.

6   Q.  Okay.  And who paid you your $70 a day?

7   A.  Like I said before, Robert or the guy from the night shift,

8   Julio.

9   Q.  Did you ever see a gentleman named Fernando Guerrero

10  parking cars at the parking lot?

11  A.  Never.  I don't even know that person.

12          MR. LUCAS:  No further questions.

13          THE COURT:  Cross-examination.

14  CROSS-EXAMINATION

15  BY MR. SAMUEL:

16  Q.  Good afternoon, sir.  I just have a couple of questions for

17  you.  You testified that you didn't start until December of

18  2015, correct?

19  A.  Correct.

20  Q.  And is it fair to say that before December of 2015, you

21  really don't have any personal knowledge as to what hours the

22  different employees worked?

23  A.  Correct, because I wasn't there at then.

24          MR. SAMUEL:  Okay.  Nothing further.

25          THE COURT:  Redirect?

1      MR. LUCAS:  None, your Honor.

2      THE COURT:  Okay.  Mr. Vargas, you may step down.

3      (Witness excused)

4      Do you have any more witnesses?

5      MR. LUCAS:  No, your Honor.

6      THE COURT:  Does the plaintiff rest?

7      MR. LUCAS:  Yes, your Honor.

8      THE COURT:  Okay.  Plaintiff rested.  It's now 12:15.

9  We can break now for lunch, Mr. Samuel, if that's okay.

10      MR. SAMUEL:  Yes, that's okay.

11      THE COURT:  Unless there's someone that you need to

12  get on and off before the end of the morning?

13      MR. SAMUEL:  No, that's fine.

14      THE COURT:  So let's come back at 1:30.  Okay?  Please

15  don't be late.  Mr. Samuel, you then will be finished today?

16      MR. SAMUEL:  Yes.  I just have the defendant and two

17  witnesses that are going to be short.

18      THE COURT:  Very well.

19      MR. LUCAS:  Is it okay to leave our papers here?

20      THE COURT:  Yes.  You can leave your papers there.  I

21  won't guarantee that they'll be there when you come back, but

22  you can leave it.  1:30, please.  Please, don't be late.

23  Please, have your witnesses ready to go.

24      (Luncheon recess)

25

I2QPHERT

1            A F T E R N O O N   S E S S I O N

2                        1:30 P.M.

3            (Trial resumed; in open court)

4            THE COURT:  Good afternoon, everyone.  Please be

5    seated.  Okay.  Mr. Samuel, are we ready to begin?

6            MR. SAMUEL:  Yes, your Honor.

7            THE COURT:  Okay.  Please call your first witness.

8            MR. SAMUEL:  Okay.  Before I call her, I just wanted

9    to address one issue.

10           THE COURT:  Sure.

11           MR. SAMUEL:  I've spoken to plaintiff's counsel

12   regarding the defendants' Star Parking Garage, Inc.

13           THE COURT:  Okay.

14           MR. SAMUEL:  And we've agreed to dismiss -- Mr. Lucas

15   has agreed to dismiss the complaint as it relates only to Star

16   Parking Garage, Inc.

17           THE COURT:  Mr. Lucas?

18           MR. LUCAS:  That is correct, your Honor.

19           THE COURT:  Okay.  That party will be dismissed.

20           Now, you can call your first witness.

21           MR. SAMUEL:  I'd like to call Gloria Genao to the

22   stand.

23           THE COURT:  She doesn't need an interpreter?

24           MR. SAMUEL:  No.

25           THE COURT:  Please step forward, please watch your

1   step, and please remain standing when you get into the witness

2   box.

3   GLORIA GENAO,

4        called as a witness by the Defendants,

5        having been duly sworn, testified as follows:

6            THE COURT:  You may be seated.  Please bring your

7   chair up, please speak directly into the microphone, and please

8   begin by stating your full name and spelling your last name for

9   the record.

10           THE WITNESS:  Gloria Genao.  Last name is G-e-n-a-o.

11           THE COURT:  Mr. Samuel.

12           MR. SAMUEL:  Okay.

13  DIRECT EXAMINATION

14  BY MR. SAMUEL:

15  Q.  Good afternoon, Ms. Genao.

16  A.  Good afternoon.

17  Q.  What is your relationship with Star Parking?

18  A.  I am the owner.

19  Q.  Okay.  Are there any other owners or just you?

20  A.  I had a partnership with my ex-husband, but they leave it

21  like that, the paperwork, but I am the owner, only myself.

22  Q.  And what exactly is Star Parking?

23  A.  Star Parking 2 is a parking garage that has a license.  It

24  is licensed for 33 cars.

25  Q.  Where is that located?

I2QPHERT                    Genao - Direct

1   A.  850 East 181st Street, and 2120 Crotona Parkway.

2   Q.  Okay.  And is Star Parking 2, is that a 24-hour lot?

3   A.  Yes, it is.

4   Q.  And how many spots are there at that lot?

5   A.  33.

6   Q.  And for how long a period of time have you owned it?

7   A.  For like the last five years, I think, from 2003 to the

8   present.

9   Q.  2013 to the present?

10  A.  2000 -- I'm sorry, 2013, yes, right.

11  Q.  And are you familiar with Roberto Herrera?

12  A.  Yeah, he used to work there.

13  Q.  Okay.  Do you remember when he first started working for

14  you?

15  A.  Yes.  It was at the end of January 2015, I think.

16  Q.  Okay.  What did Mr. Herrera do for you?

17  A.  Park the cars.

18  Q.  And was he assigned a specific shift?

19  A.  Yes.

20  Q.  And what was the shift?

21  A.  The morning shift.

22  Q.  Okay.  And what time does the morning shift start?

23  A.  7:00 in the morning.

24  Q.  7:00 a.m.?

25  A.  Yes.

1   Q.  And what time does that shift end?

2   A.  It's supposed to be at 2:00.  Sometimes they get out early

3   out 1:00, or they say, my kids, they want to go do something, I

4   get them early, 1:30 or something.

5   Q.  1:30 or 2:00 p.m.?

6   A.  Yes.

7   Q.  That's when the shift would end?

8   A.  Yes.

9   Q.  Okay.  And what days of the week was would that shift?

10  What days of the week?

11  A.  Usually the one in the morning worked from Monday to

12  Friday.

13  Q.  Okay.  And how about Mr. Herrera?

14  A.  He used to work Monday through Friday.

15  Q.  Okay.  And did he ever work on the weekends or just Monday

16  and Friday?

17  A.  No, Monday through Friday.

18  Q.  Okay.  And what would happen when that morning shift was

19  over at around 1:30 or 2:00 p.m.?

20  A.  I used to arrive at the parking to cover two to three

21  hours, or one of my sons.

22  Q.  So at around 2:00, either you would come --

23  A.  Or Kendrick, mostly they want to come at that time.

24  Q.  I'm sorry I didn't understand.

25  A.  Mostly it was Kendrick or me that come at that time.

I2QPHERT                           Genao - Direct

1   Q.  So either you or Kendrick would --

2   A.  Uh-huh, also, most of the time, it was Kendrick that come

3   at that time also.

4   Q.  So either you or Kendrick would come to the lot around

5   2:00?

6   A.  Yes; mmm, hmm.

7   Q.  Okay.  And who is Kendrick?

8   A.  My son.

9   Q.  And did that shift have a name?  Was it the afternoon

10  shift?

11  A.  Yeah, I call it the afternoon.

12  Q.  And how long did that shift last for?

13  A.  That shift supposed to cover to 11:00, but as soon as I

14  finish, like around 3:00, 4:00, my other son, Robertico, he

15  used to come and stay until 11:00, 11:30, sometimes to 12:00.

16  Q.  I think you said the name Robertico?

17  A.  Oh, that's a nickname.

18  Q.  So Robertico is your son?

19  A.  Yes, my second son.

20  Q.  And he's also called Roberto?

21  A.  Robertico, that's the nickname that we call him.

22  Q.  Okay.  So on the days that you worked the afternoon shift,

23  how many hours would you stay for?

24  A.  Two or three hours.

25  Q.  Okay.  And then where would you go after that?

I2QPHERT                        Genao - Direct

1    A.  I have to -- I had another kid, ten years old now, and also

2    I have to take care of my other business and my house, things

3    like that.

4    Q.  Okay.  And what other business do you have?

5    A.  Another parking garage.

6    Q.  Okay.  And is that called Star Parking Garage, Inc.?

7    A.  Yes.

8    Q.  Okay.  So when you were done working at Star Parking 2, you

9    would sometimes go to the other one?

10   A.  Yes, because I usually have my office over there.

11   Q.  Okay.  Let me show you what's been previously marked as

12   Plaintiff's Exhibit 3.

13   A.  Okay.

14   Q.  I'm showing you a document that was used by plaintiff's

15   counsel earlier today, and I believe you were here for the

16   testimony of Mr. Herrera when he discussed that wage notice?

17   A.  Mmm, hmm.

18   Q.  Can you tell me what that document is?

19   A.  This is a document that I supposed to sign all my employee

20   when they start working on my lot.

21   Q.  Okay.  And what was the purpose of that form?

22   A.  Because when I start -- when I opened my -- the other one,

23   Star Parking Garage, Inc., that was the first one, one person

24   from the work -- how, employment enforcement, something like

25   that, show me this paper that that's the paper that I supposed

1    to give it to all the employees to hire them and let them know

2    how much they're going to get pay per hour.

3              THE COURT:  Just because the record is clear, because

4    the binder that you gave me earlier, Mr. Samuel, has Exhibit 2

5    the document that I see Ms. Genao holding.

6              THE WITNESS:  This one?  Mmm, hmm.

7              THE COURT:  Which is the one-page notice and

8    acknowledgment of pay rate.

9              MR. SAMUEL:  Right, right.

10             THE COURT:  You referred to that as Defendants' 3.

11             MR. LUCAS:  If I could clarify, your Honor?  It was

12   marked as Plaintiff's 3 and also as Defendants' 2?

13             MR. SAMUEL:  Yes.

14             MR. LUCAS:  Okay.

15             MR. SAMUEL:  I'm sorry, plaintiff used it, and it was

16   called Plaintiff's 3.

17             THE COURT:  Okay.  So you're referring to Plaintiff's

18   3?

19             MR. SAMUEL:  Yes.

20             THE COURT:  Okay.  Got it.

21   BY MR. SAMUEL:

22   Q.  So what information is on the document labeled Plaintiff 3?

23   A.  Their name, the name of my parking garage, their hours, how

24   much they're gonna get, and that's the initials.

25   Q.  Okay.  And was that document filled in by you?

1   A.  No.  Part of the document.

2   Q.  Okay.  Which part of the document did you --

3   A.  The information with the parking garage, what he gonna get

4   per hours, and the day or what days is the payday, and I sign.

5   Q.  Okay.  And when you say "he," does that page refer to

6   Roberto Herrera?

7   A.  Yes.

8   Q.  Okay.  Is there a space on that form for your signature?

9   A.  Yes, all the way to the bottom.

10  Q.  Okay.  And did you sign it?

11  A.  Yes, I did sign it.

12  Q.  Okay.  And did you give that document to Roberto Herrera to

13  sign?

14  A.  Yes, uh-huh.  And this document is in Spanish and in

15  English too.

16  Q.  And were you there when Mr. Herrera signed the document?

17  A.  Yes; uh-huh.

18  Q.  Okay.  And what did you do after he signed the document?

19  A.  I keep the paper.

20  Q.  Okay.  And what was the pay rate on that form?

21  A.  The what?

22  Q.  How much was the pay rate on the form?

23  A.  If I recall that time, 2015, it was the one day rate -- the

24  pay rate was $9.  Before that it was 7-something, but he

25  working there by that time.  That's why I gave him the pay

I2QPHERT                        Genao - Direct

right away when he came to work for me because I notice that by

that time, the pay rate change, the payroll change at the end

of December 31st of that year.

Q.  Okay.  But the pay rate on that form was $9 an hour?

A.  Yes.

Q.  Okay.  Let me show you another document that's been marked

as Defendant's Exhibit 2.

        THE COURT:  Again, for Defendants' 2, what I have is

the notice of pay rate.

        MR. SAMUEL:  Oh, I think the pay rate notice is

Plaintiff's 2.

        THE COURT:  No.

        MR. SAMUEL:  I'm sorry?

        THE COURT:  It's Plaintiff's 3.

        MR. SAMUEL:  Plaintiff's 3.  And the document that I

just gave to the witness was Defendants' 2.

        THE COURT:  I have that as Defendants' 5.  I'm just

going by the binder that you gave me.

        MR. SAMUEL:  Okay.  So I apologize.  We'll go with

Defendants' 5.

BY MR. SAMUEL:

Q.  Okay.  Can you please take a look at that document and just

tell us what that is?

A.  This is the record that I keep every time my worker give me

the money that they made that day, and I just can see how much

1  they make every day.  $100, $75, that's like 15 cars per day or

2  20.

3  Q.  And how did you keep that document?

4  A.  I -- how I showed you, I had the notebook, the red one that

5  you make up the copy.  I keep it that one, and now I have new

6  one, but back then, it was that one.

7  Q.  But on a daily basis, how would you fill out that document?

8  A.  Well, I count the ticket that they make that day and the

9  money and the record of the paper, and then I write it down

10 with the name of who worked, the one that take that money and

11 what date.

12 Q.  So you would write the attendant's name down and you would

13 write down how much money they brought in each day?

14 A.  Uh-huh.

15 Q.  And would that document contain the names of all the

16 attendants that worked that day?

17 A.  Yes.

18 Q.  Okay.  And would your name be on the document?

19 A.  No, because I the owner.  I'm not going to like keep money

20 from my worker.

21 Q.  Would Kendrick's name be on that form?

22 A.  No.

23 Q.  And why not?

24 A.  Because he's my son, and I don't see why I have to put how

25 much he made here.

I2QPHERT                      Genao - Direct

1   Q.   Okay.  And what about Robertico?

2   A.   The same thing.

3   Q.   Okay.  So aside from you, Kendrick and Robertico, the names

4   of the other attendants --

5   A.   Yes.

6   Q.   -- would be on that form?

7   A.   Yes; mmm, hmm.

8   Q.   And if somebody's name didn't appear that one day, what

9   would that mean to you?

10  A.   They don't work that day.

11  Q.   Okay.  And if you can take a look at that -- that those

12  documents, let's say you go to November of 2015?

13  A.   Okay.

14          THE COURT:  Is that Defendants' page 28 at the bottom?

15          MR. SAMUEL:  Yes.

16  A.   Okay.  I got it.

17  Q.   Okay.  So what, if anything, does that page tell you about

18  the dates that Roberto Herrera worked that month?

19  A.   That Fernando was working for me there too.  I'm sorry, can

20  you repeat the question?

21  Q.   Okay.  All right.  Did Roberto work every day of

22  November 2015?

23  A.   No, no.

24          THE COURT:  I'm sorry, I just want to make sure that

25  the record is clear.  What I'm looking at now is page 28 of

I2QPHERT                        Genao - Direct

1  Defendants' 5, and the very top notation at the top of the page

2  lists 11-23-15/Fernando.  Is that where you are, Mr. Samuel?

3            MR. SAMUEL:  Yes.

4            THE COURT:  Okay.

5  Q.  So if you look at the date, let's say November 24th of

6  2015, how many attendants worked on that date?

7  A.  How many?  It was Fernando, Julio, me and Kendrick.

8  Q.  Okay.  So is it your understanding that Roberto Herrera did

9  not work that day?

10  A.  No, because he was out of the country.

11  Q.  What about after he came back from the Dominican Republic,

12  if you look at November 28th of 2015?

13  A.  Yeah, he start working again.

14  Q.  Okay.  So let's go to December 7th of 2015.

15  A.  Mmm, hmm.

16  Q.  Did Roberto work on that day?

17  A.  December what?

18  Q.  7th.

19  A.  No, because it was a weekend, and that day was Fernando

20  working for me.

21  Q.  Okay.

22  A.  And also, you see after the 28th, you see Fernando work the

23  day because he was working too.

24  Q.  So Roberto did not work on the weekends?

25  A.  No.

1    Q.  Okay.  And if you go ahead, let's say, to December 20th of

2    2015, on the next page --

3    A.  Uh-huh.

4    Q.  -- do you know if Roberto worked on that day?

5    A.  No.  He missed that day, and I have to call one of my old

6    employee from the other parking to cover me because I don't

7    have no one to work because my kid have to do the afternoon and

8    myself; so I put one of my employees from the other parking

9    lot.

10   Q.  Okay.  And what about December 21st, did Roberto work on

11   that day?

12   A.  No, I have to pull Luis again.

13              THE COURT:  I'm sorry, can we go to December 20th?

14              THE WITNESS:  Mmm, hmm.

15              THE COURT:  There's two entries, one for Julio and one

16   for Fernando, correct?

17              THE WITNESS:  Where, December?

18              THE COURT:  December 20 of 2015.

19              THE WITNESS:  Okay.  One second.  Yes, December 20.  I

20   don't see it here.

21              THE COURT:  On page 29, do you see the bottom?

22              THE WITNESS:  29?  Mmm, hmm.  Okay.  Yes.

23              THE COURT:  Are you with me?

24              THE WITNESS:  Uh-huh.

25              THE COURT:  So you have two entries for December 20,

I2QPHERT                     Genao - Direct

1    one says Julio, $7, and Fernando, 143, correct?

2             THE WITNESS:  Yes, uh-huh.  I see.

3             THE COURT:  And I'm sorry, did I hear you say on that

4    day, because Mr. Herrera didn't work, you brought in another

5    employee?

6             THE WITNESS:  No, no, I see here it was in the wrong

7    payment.  I see Luis in the other page.

8             THE COURT:  What other page?  What day?

9             THE WITNESS:  The next one, Luis.  I was in the wrong

10   place.  Wait.  Let me look at this.  Okay.  I saw the name

11   Luis, that's why I brought this up.  Maybe I look on the wrong

12   date.  It was 1-20-2015 that I was, 1-20-2015.

13            THE COURT:  1-20-2015?

14            THE WITNESS:  Uh-huh.

15            THE COURT:  So that's at page 27?

16            THE WITNESS:  Yes, that's the page that I was looking.

17            THE COURT:  Okay.

18   BY MR. SAMUEL:

19   Q.  So the document that I showed you, would it be fair to say

20   that any date that did not have Roberto's name next to it would

21   be a day that he didn't work?

22   A.  Yes; uh-huh.

23   Q.  Now, Mr. Herrera testified that he went to the Dominican

24   Republic in November of 2015; is that correct?

25   A.  Yes.

1    Q.   And there was some testimony earlier that you lent him

2    money when he was in the Dominican Republic?

3    A.   Yes, I do remember that.

4    Q.   How much did you lend him?

5    A.   $500.

6    Q.   And did he ever pay you back?

7    A.   No.

8    Q.   And was there an arrangement for him to pay you back?

9    A.   Yeah, he supposed to pay me little by little, but he always

10   had an excuse that he doesn't have the money, that he would

11   give me this week, that he has problem with his wife, or I

12   don't know who she is, and he never pay me back.  After the day

13   when he left, he never told me that he's going to leave, he

14   left and left Fernando there, and with Fernando, he was the one

15   that communicated that he left the job.

16   Q.   And there was also some testimony about a car that you sold

17   to Mr. Herrera?

18   A.   Yes.

19   Q.   And what was the value of the car?

20   A.   It was -- at that moment, it was at 2,000 -- I don't

21   remember exactly what year it was, but it was a fair car, it

22   was in good condition.

23   Q.   And how much did you sell the car for?

24   A.   For 2,800.

25   Q.   And do you remember when that was?

I2QPHERT                          Genao - Direct

1    A.  Yeah, it was like in the middle of the summer of that year.

2    Q.  Of 2015?

3    A.  Mmm, hmm.

4    Q.  And was there an arrangement for him to pay you for the

5    car?

6    A.  No, because when I -- when I put the car with lien, I have

7    to wait for the paperwork to clear and everything.  When I get

8    that title for that car, I give it to him and he register the

9    car.

10   Q.  Did you ever give him the title for the car?

11   A.  Yeah, when I get it, I give it to him.  And he started

12   paying me little by little, but he never finish paying me that

13   car.

14   Q.  And how much of the 2,800 did he repay you?

15   A.  If I don't go wrong, I have to have it on these pages that

16   I give it to you because I have it there.  Less than the 2,000

17   he pay me.

18   Q.  Now, when Roberto Herrera was working, you said his shift

19   was from 7:00 a.m. to 2:00 p.m.?

20   A.  Yes, sir.

21   Q.  And how much did you pay him for the time he was working

22   there?

23   A.  It was like 300 and something.

24   Q.  Is that per week?

25   A.  Yes.

1    Q.  And do you recall how much it was?

2    A.  Not exactly how much it was, no.  It was 300 and something.

3    I don't remember exactly.

4            MR. SAMUEL:  Your Honor, I would like to show the

5    witness a document that says Star Parking 2 on it.

6            THE COURT:  Okay.

7            MR. SAMUEL:  Do you have a marking as to what exhibit

8    that is?

9            THE COURT:  I'm sorry, it says what?  Is it a

10   handwritten document?

11           MR. SAMUEL:  It is a handwritten document like -- no.

12           THE COURT:  It says --

13           MR. LUCAS:  Your Honor, I wonder if it would be

14   possible to take a brief break so that I could get a copy of

15   defendants' exhibits with the markings on them so I know what

16   they're referring to.

17           THE COURT:  Well, again, I think we may have gotten

18   off track.  I think the first exhibit that you referred to,

19   Mr. Samuel, was the complaint in the case, which is not the

20   first exhibit in your binder.  The first exhibit in your binder

21   is plaintiff's automatic disclosures.  I mean, you can borrow

22   this.  I haven't written in it.

23           MR. SAMUEL:  If I could, I'll just refer to however it

24   was marked in the submission.

25           (Pause)

BY MR. SAMUEL:

Q.  Let me show you a document that's Defendant's Exhibit 3.

A.  Yes.

Q.  Can you take a look at that document and just tell us what that document is?

A.  That is a sign-in sheet that I put it to sign to keep it for myself for proof that I paid them and how much I paid, because that pay also was given to me by the force employment thing.  The one that gave me this one, he told me to keep record on that.

Q.  Okay.  So how did you -- did you fill that out on a daily basis, a weekly basis or something else?

A.  Every week when I give the check, I fill it out and they sign.

Q.  Okay.  And did all the employees get checks, cash or something else?

A.  No, not the check, the envelope cash.

Q.  So what would the procedure be on payday?

A.  I fill out the papers, and I just say if the person right there, sign, and the next person that supposed to go after they -- you know, they the other shift, they sign and leave it there for me because I not gonna be in the morning there.

Q.  So you would leave that form there?

A.  Mmm, hmm.

Q.  And each employee when they picked up their check, they

1    would sign it?

2    A.  Yeah; uh-huh, sign it.

3           THE COURT:  I'm sorry, you say when they picked up

4    their check, were they --

5           THE WITNESS:  Not a check, the cash with the envelope.

6    I put the money in the envelope because usually I don't see the

7    one in the night that go at 12:00 because I always go in the

8    afternoon, in the afternoon.

9    Q.  Okay.  And was the procedure for you to always fill it out

10   before they signed it?

11   A.  Yeah.

12   Q.  Okay.  Now, I believe you were here earlier when

13   Mr. Herrera testified that he had a picture of one of the pages

14   where it was signed on the right-hand side but the other

15   information was left blank?

16   A.  Yes.

17   Q.  Can you please tell the Court why that was?

18   A.  Because I was out of the country, like, for three times the

19   same month, or twice the same month, and I leave it to my son,

20   and he did it for me.  I told him not to ruin anything, to have

21   them sign to have proof that they get paid, and that was the

22   only one that was like that because why he doesn't have no more

23   pictures of blank pages.

24   Q.  So the exhibit that he was referring to earlier that was

25   signed before there was any information regarding the pay

1    information, was that the only one that was done like that, or

2    were there --

3    A.  Yes, because I got my passport.  I got proof that I was out

4    of the country twice in the same month, and that's why I leave

5    the payment to my son.

6    Q.  Now, did Kendrick and Roberto get paid for working in the

7    lot?

8    A.  Yes; uh-huh.  I give money to them.

9    Q.  But is their name contained on those sheets?

10   A.  No.  They my son, and I pay their insurance, their car,

11   like that; so we have --

12   Q.  Now, earlier there was some testimony about a police report

13   made towards the end of his employment.  Could you just tell

14   the Court what that was relating to?

15   A.  Okay.  That was an incident that happened on the parking

16   garage inside during his shift that he's supposed to be

17   working.  He put a rental person that I didn't even know who he

18   was, and I don't know who he signed who was the person, he

19   brought him to work for him for a couple of hours.  I don't

20   know how many us hours.

21       During that hours, there was an incident inside the

22   parking lot actually with one car.  So the lady make a report

23   to the police.  The police went to the parking garage and was

24   asking who was the driver of that car that day.  And what I

25   told the police was, I don't know who was the driver but my

1    employee is Roberto Herrera.

2              So he was the one that supposed to be here during his

3    shift here, and that was what happened there.  So from there, I

4    don't know what's going on because I wasn't there, and I told

5    the truth to the police and the lady that was parking at that

6    time in my parking garage.

7    Q.  Okay.  Just going back for one moment, I think I asked you

8    earlier how much Mr. Herrera made every week.  Can you take a

9    look at the document that I showed you.  Does that tell you how

10   much you paid him every week?

11   A.  This one?  Oh, yes.  Yes; uh-huh.  Yes, it's here.

12   Q.  And how much was it every week?

13   A.  He's here saying 325.

14   Q.  $325 per week?

15   A.  Uh-huh, for five days.

16   Q.  And was that based on an hourly rate?

17   A.  Yes.

18   Q.  And what was the hourly rate?

19   A.  $9, at the time that he start working for me.

20   Q.  And how many hours does that show that he worked?

21   A.  Seven hours, six hours.  It depend because how I told you

22   sometime he leave early because I get there early too.

23   Q.  But on a weekly basis, how many hours did he do per week?

24   A.  Like 30-something.

25   Q.  Take a look at the document if that refreshes your

I2QPHERT                          Genao - Direct

1    recollection.

2    A.  Yeah, 30-something.  36.

3    Q.  36?

4    A.  Mmm, hmm.

5    Q.  So 36 times nine is $325?

6    A.  Yes.  It is, yes.

7    Q.  Do you know if there were any other times that Mr. Herrera

8    used somebody else to work a shift for him?

9    A.  He used to do it like a couple of hours with Fernando.

10   Q.  And aside from Fernando, do you know if there were any

11   other times?

12   A.  No.

13   Q.  Do you know who the witness Alvaro was that testified

14   before?

15   A.  No, I didn't know that person.

16   Q.  So you never hired that person?

17   A.  No.

18   Q.  Do you know who might have hired him to work Roberto's

19   shift?

20   A.  From what I hear, he say that I used to pay $70; so that

21   means one shift.  So I don't know why he's not here in my list,

22   if he supposed to do the whole shift for him.  So -- and I

23   didn't know him.  I didn't know that person.

24   Q.  Okay.  And now, since Mr. Herrera left, who took over his

25   shift?

1   A.   Fernando.

2   Q.   And what hours are Fernando working?

3   A.   Now?  7:00 to 2:00.

4           MR. SAMUEL:  Okay.  I have no further questions.

5           THE COURT:  Cross-examination?

6           MR. LUCAS:  Thank you, your Honor.

7   CROSS-EXAMINATION

8   BY MR. LUCAS:

9   Q.   Ms. Genao, your lawyer asked you a few questions when he

10  just referred to Star Parking --

11  A.   Yes.

12  Q.   -- without saying Star Parking Garage, Inc. or Star Parking

13  2.  Did you hear those questions?

14  A.   Star, what?  I think he refer to Star Parking 2 because he

15  never worked for me in my other company.

16  Q.   Right.  So I just want to clarify for the record that when

17  your lawyer was referring to just Star Parking, he was

18  referring to Star Parking 2?

19  A.   Yes, I'm sure about that.

20  Q.   Okay.  And that was an unincorporated business?

21  A.   At Star Parking 2?  It's a partnership.

22  Q.   But it was not incorporated?

23  A.   No.

24  Q.   Do you have a written partnership agreement?

25  A.   Yeah, the one that we have from the State.

I2QPHERT                    Genao - Cross

1   Q.  You mean the Department of Consumer Affairs license?

2   A.  Yes.

3   Q.  Right.  But apart from that, did you have any documents --

4   A.  35, at 35, yes, I do have.

5   Q.  Do you have it with you?

6   A.  No, I don't have it with me.

7   Q.  Who else besides you was the partner in that?

8   A.  My ex-husband.

9   Q.  That's Roberto Vasquez?

10  A.  Roberto Vasquez.

11          MR. LUCAS:  Your Honor, may I approach and look at the

12  binder just to ascertain the title of an exhibit?

13          THE COURT:  Sure.

14          MR. LUCAS:  Thank you.

15  Q.  Ms. Genao, may I please see your binder for just a moment?

16  A.  Yes.

17  Q.  Thank you.  Okay.  Here you are.

18          Okay.  Ms. Genao, I want to ask you a question about

19  what was marked as Defendant's Exhibit 5.  So could you please

20  go to Tab 5 in your binder?

21  A.  Yes; uh-huh.  Mmm, hmm.

22  Q.  Can you please go to the page where the top entry is

23  January 12th, 2015?

24          THE COURT:  What's the page number at the bottom?

25  A.  I have it.

1   Q.   If you can't read one --

2   A.   I got it.

3   Q.   Oh, you've got it?

4   A.   Yeah.  Okay.  I have it here.

5   Q.   Okay.  Because of the copy quality, I can't read the page

6   number, if any, that may be on the bottom.

7   A.   No, I have it.

8   Q.   Okay.  At the bottom of that, it says January 31, '15; do

9   you see that?

10  A.   Mmm, hmm.

11  Q.   Okay.  And then if you look to the next page, it skips all

12  the way to November 23rd, 2015.  So do you have --

13  A.   Mmm, hmm.

14  Q.   Ten months are missing.  Where are --

15  A.   He didn't make a copy because I had -- it's the red book,

16  and I have all the page stick together.

17  Q.   I see.  Okay.

18  A.   I have records for the whole year.

19  Q.   So the dollar figures on Defendant's Exhibit 5 represent

20  the amount of parking fees that each attendant --

21  A.   Yes.

22  Q.   -- brought in each day?

23  A.   Mmm, hmm; yes.

24  Q.   Okay.  Why was it important for you to track that

25  information?

1    A.  To know how many cars during the shift gets in.  Like,

2    let's see if I know it's 33, I know it's -- that was like three

3    or four car, to know how much and to keep the track of the

4    money that get into the parking because I have to report that

5    to the IRS.

6    Q.  Is it very important for you to accurately report that to

7    the IRS?

8    A.  Yes, I have to.

9    Q.  Okay.  So why, in this entire exhibit, is there not a

10   single entry relating to any of your sons working there and

11   bringing in money?

12   A.  No, because I know how much we made during that period of

13   time.

14   Q.  How much did your sons make on October 10th in parking

15   fees?

16   A.  I don't have it here, but I can tell you because I have

17   it -- this is not the only record that I have for my business.

18   Q.  Where would you look to find that?

19   A.  In all my paperwork that I have.

20   Q.  What paperwork?

21   A.  All my binders they have all the paper from my parking

22   garage.

23   Q.  So Defendant's Exhibit 5 is only a partial list of the

24   parking income that you received?

25   A.  No, that notebook is only for my employees.  That's why

1   it's only my employees in my notebook, but the one that I have

2   for my accountant is the different one.

3   Q.  So you have maintained a completely separate record for the

4   parking fees that your sons collected?

5   A.  Not only my sons, the whole parking at the same time

6   because those ones going to my accountant, and the one I owe my

7   tax IRS every year.  That's something different for this one.

8   This is for my record.

9   Q.  Did you maintain a daily record of the amount of parking

10  fees that you claim your sons collected?

11  A.  In there, in the one that I give to my accountant, yes.

12  Not only him, all the employees.

13  Q.  In 2015, did you leave the country?

14  A.  2015?  Yes; mmm, hmm.

15  Q.  When?

16  A.  It was --

17  Q.  Are you looking at a document right now?

18  A.  No, no, not this because my name is not on this page.

19  Q.  Okay.

20  A.  It was like February -- no, 2015, wait.  No, not in 2015.

21  I'm not sure because I used to go out of the country a lot.

22  Q.  Where did you go?

23  A.  Dominican Republic.

24  Q.  Okay.  When did you go in 2015?  You mentioned your

25  passport, did you bring it to court today?

I2QPHERT                         Genao - Cross

1   A.  Yes, I have it here.

2   Q.  Would it be okay if I took a look at it?

3   A.  Yes, not a problem.  It's on my back, right there.

4           MR. LUCAS:  Would the Court allow me to take a look

5   at --

6           THE COURT:  Why don't you get down and get it.

7           THE WITNESS:  Okay.

8           MR. LUCAS:  Okay.

9           (Pause)

10          THE COURT:  Okay.  Now the question before you is when

11  did you travel outside of the United States in 2015?

12          Am I correct, Mr. Lucas?

13          MR. LUCAS:  Correct, your Honor.

14  A.  Okay.  I went in April.

15  Q.  April what?

16  A.  April 12th.

17  Q.  And when did you come back?

18  A.  I have to go through all of this.  If you want, you can do

19  yourself.

20          MR. LUCAS:  With the Court's permission, can I?

21          THE COURT:  Sure.

22          MR. LUCAS:  Would the Court allow a brief recess to

23  allow us to make a little chart of the dates that she left?

24  This is rather important testimony, and the way that it's all

25  stamped is a little disjointed.

1          THE COURT:  Ten minutes.

2          MR. LUCAS:  Okay.  Thank you, your Honor.

3          (Recess)

4          THE COURT:  Mr. Lucas, how are you doing?

5          MR. LUCAS:  I need a few more minutes.  The passport

6    had been taken from me, and Mr. Samuel just gave it back to me;

7    so I'm going to need a few more minutes to look at this.  I

8    apologize.

9          THE COURT:  Okay.  You can be seated, Ms. Genao.

10         (Pause)

11         MR. LUCAS:  If it's okay with the Court, I'd like to

12   approach the witness.

13         THE COURT:  Okay.

14   BY MR. LUCAS:

15   Q.  Ms. Genao, I want to show you an entry from --

16         THE COURT:  Please keep your voice up, sir.

17   Q.  -- from your passport --

18   A.  Mmm, hmm.

19   Q.  -- indicating that you entered the Dominican Republic on

20   January 7th, 2016; do you see that?

21   A.  Yes, okay.

22   Q.  Okay.  And how long were you gone during that trip?

23   A.  I don't recall.  It's there because it's stamped when I go

24   out and in.  That's why you took my passport from me and I let

25   you see it so you can find out.  I told you I was out of the

I2QPHERT                          Genao - Cross

1    country from November 2015 and in and out through the end of

2    January, and it's right there.

3    Q.  Okay.  So let's see.  You were in and out from the

4    Dominican Republic --

5    A.  Yes.

6    Q.  -- from December 2015 to the end of January 2016?

7    A.  No, no.  I think it's November, at the end of November.

8    Q.  Okay.  You were in and out?

9    A.  Yes.

10   Q.  Why were you in and out so much during that period of time?

11   A.  Because I have family matter there in Dominican Republic.

12   Q.  Okay.

13   A.  Personally.

14   Q.  Okay.  And the document previously marked as Plaintiff's

15   Exhibit 1.  I don't know if you have it.  I will show it to

16   you, if you don't.

17   A.  This one?

18   Q.  Yes.

19   A.  Yes, I do have it.

20   Q.  So that picture includes all the periods of time that you

21   were still in the United States during that period, correct?

22   A.  Yes, uh-huh.

23   Q.  Okay.  No further question on that topic.

24       Does Julio still work for you?

25   A.  Yes.

1           MR. LUCAS:  No further questions, your Honor.

2           THE COURT:  Redirect?

3           MR. SAMUEL:  Nothing further.

4           THE COURT:  Okay.  Ms. Genao, you may step down.

5           THE WITNESS:  Thank you.

6           (Witness excused)

7           THE COURT:  Mr. Samuel, do you have another witness?

8           MR. SAMUEL:  Yes, let me just step out.

9           (Pause)

10          Your Honor, I'd like to call Kendrick Vasquez to the

11  stand.

12          THE COURT:  I'm sorry, could you repeat the name?

13          MR. SAMUEL:  Kendrick Vasquez.

14          THE COURT:  Okay.  Mr. Vasquez, please stand up all

15  the way towards the front and please enter the witness stand to

16  my right and remain standing.

17  KENDRICK VASQUEZ,

18       called as a witness by the Defendants,

19       having been duly sworn, testified as follows:

20          THE COURT:  Okay.  Please be seated.  Please pull the

21  chair up to the microphone and, sir, please begin by stating

22  your full name and spelling your last name.

23          THE DEPUTY CLERK:  Kendrick Vasquez, V-a-s-q-u-e-z.

24          THE COURT:  You may proceed.

25

1    DIRECT EXAMINATION

2    BY MR. SAMUEL:

3    Q.   Good afternoon, Mr. Vasquez.

4    A.   Good afternoon.

5    Q.   What is your relationship with the defendant Gloria Genao?

6    A.   She's my mother.

7    Q.   Okay.  And the lot that we've been speaking about, Star

8    Parking 2, have you ever worked at that lot?

9    A.   Yes, I did.  I still do.

10   Q.   When, for the first time, did you work there?

11   A.   Since I was like 16-and-a-half.  That's when I got my

12   license, and I started working there.  So let's say three years

13   ago.

14   Q.   Three years ago.  So approximately 2015?

15   A.   Yeah.

16   Q.   Okay.  And were you assigned a specific shift?

17   A.   No, because we always used to split a shift, my brother and

18   I and my mom too.

19   Q.   And what's your brother's name?

20   A.   Roberto.

21   Q.   And Roberto's last name is what?

22   A.   Vasquez.

23   Q.   All right.  So when you say that you used to split a shift,

24   what shift did you used to split?

25   A.   It would be from 5:00 to 12:00.  So sometimes my brother

1    would go in or I would go in; so that's what I mean by split

2    the shift.

3    Q.   Okay.  And did you ever start work before 5:00 p.m.?

4    A.   Yeah, I used to go in with my mother sometimes, but that

5    wasn't my shift.  I would go in with her.

6    Q.   You would go in with your mother sometimes?

7    A.   Yeah.

8    Q.   And what time would her shift be?

9    A.   From 2:00 to 5:00 or 4:00.

10   Q.   That's 2:00 p.m. to around 4:00 or 5:00 p.m.?

11   A.   Yeah, correct.

12   Q.   And at any one time, how many parking lot attendants were

13   working?

14   A.   Can you repeat the question?

15   Q.   Yes.  How many attendants worked each shift?

16   A.   One.

17   Q.   And are you familiar with the plaintiff, Roberto Herrera?

18   A.   Yeah, I am.

19   Q.   And how are you familiar with him?

20   A.   He used to work there from Monday to Friday from 7:00 to

21   2:00.

22   Q.   Do you remember when he first started working at Star

23   Parking 2?

24   A.   No, I don't really remember, but it's been -- I can't give

25   you an exact date.

1    Q.   Okay.  And when you were done with your shift at

2    approximately 12:00 a.m., who would come to relieve you?

3    A.   Julio.

4    Q.   And what was his shift, from when to when?

5    A.   It would be from, yeah, Monday to Friday from 12:00 to

6    7:00.

7    Q.   12:00 to 7:00 a.m.?

8    A.   Correct.

9    Q.   Okay.  And who was in charge of keeping track of

10   everybody's hours at the parking lot?

11   A.   My mother.

12   Q.   Okay.  And did you ever get involved in that?

13   A.   No.

14   Q.   And do you know how your mother kept track of the hours?

15   A.   No.  It wasn't my business.  It was my mom's parking lot;

16   so I never questioned anything.

17   Q.   Okay.  And at some point, towards the end of 2015, did your

18   mother leave the country?

19   A.   Yeah.

20   Q.   Do you remember when that was, approximately?

21   A.   No, I don't remember.

22   Q.   Okay.  And who was in charge of payroll when your mother

23   wasn't in the country?

24   A.   I was, but my mom left everything in order for me; so all I

25   would have to do is drop everything off in envelopes.  I would

1    just go drop it off, and that was it, and I never questioned

2    anything.

3    Q.  What exactly did you drop off?

4    A.  Usually a slip and envelope.  The envelopes was their pay

5    and a piece of paper.

6    Q.  And what was the piece of paper?

7    A.  Well, I never read the paper, but I'm pretty sure the paper

8    was like -- I don't know what the paper is called.  It used to

9    say -- all I know is they had to sign what she was signing.  It

10   wasn't my business to get into.

11   Q.  Do you know if the paper was filled out before they signed

12   it when your mother was away?

13   A.  No, I don't know.

14   Q.  Did you ever look at the paper?

15   A.  Nope.

16   Q.  Do you know if anybody else ever worked during a shift that

17   Roberto Herrera was supposed to work?

18   A.  Yeah.

19   Q.  And how often would that be?

20   A.  I seen it like three, four times.

21   Q.  Okay.

22          MR. SAMUEL:  I've got no further questions.

23          THE COURT:  Cross-examination?

24          MR. LUCAS:  Thank you, your Honor.

25

1    CROSS-EXAMINATION

2    BY MR. LUCAS:

3    Q.  Mr. Vasquez, who is it that you just said you saw three or

4    four times?

5    A.  Fernando, and I seen other people too.

6    Q.  You only saw him three or four times; is that correct?

7    A.  I seen Fernando, and I seen other people, but I don't know

8    who they were.  I just seen Fernando, and I know him because he

9    works there currently.

10   Q.  Okay.  But you saw him three or four times during the time

11   that Roberto Herrera worked for Star Parking 2?

12   A.  Correct.

13   Q.  What is your date of birth?

14   A.  April 10th, 1998.

15   Q.  1990?

16   A.  '8.

17   Q.  1998.  Thank you.  And you started working at Star Parking

18   2 when you were 16-and-a-half?

19   A.  Yeah, around there.  When I got my driver's license.

20   Q.  And did you finish high school?

21   A.  Correct.

22   Q.  Okay.  And when did you graduate high school?

23   A.  Last year.

24   Q.  When, what month?

25   A.  June -- no, July -- no, sorry, June.

1    Q.  June of 2017?

2    A.  Yeah.

3    Q.  So if I understand the testimony, while you were in high

4    school, you were working a shift until midnight at the parking

5    lot; is that correct?

6    A.  Correct.

7    Q.  And this, you said you split a shift with your brother.

8    What do you mean by "split a shift"?

9    A.  He would take days; so we used to split the five days.  He

10   usually would take the shift, or I would take the shift.

11   Q.  So that means you worked two-and-a-half days a week?

12   A.  Depending.  It would depend on him and then on me.

13   Q.  But collectively, the two of you combined, worked the

14   equivalent of five seven-hour shifts each week; is that

15   correct?

16   A.  Correct.

17   Q.  Okay.  And you worked at Star Parking Garage, Inc. and Star

18   Parking 2; is that correct?

19   A.  What do you mean?

20   Q.  The other parking lot?

21   A.  No, I only worked at one.

22   Q.  So you only worked at Star Parking 2?

23   A.  Yeah.

24           MR. LUCAS:  Okay.  No further questions.

25           THE COURT:  Any redirect?

 1           MR. SAMUEL:  No, I don't.

 2           THE COURT:  Mr. Vasquez, you may step down.

 3           (Witness excused)

 4           Mr. Samuel?

 5           MR. SAMUEL:  We have one final witness.

 6           THE COURT:  Okay.  Bring him or her in.

 7           (Pause)

 8           And who is this?

 9           MR. SAMUEL:  This is Roberto Vasquez.

10           THE COURT:  Okay.  Mr. Vasquez, please step forward

11    and please come up and step into the witness stand next to me

12    and remain standing:

13    ROBERTO VASQUEZ,

14         called as a witness by the Defendants,

15         having been duly sworn, testified as follows:

16           THE COURT:  Okay.  You may be seated.  Please pull

17    your chair up, speak directly into the microphone in front of

18    you and, Mr. Vasquez, if you could begin by stating your full

19    name and spelling your last name.

20           THE WITNESS:  My name is Roberto Vasquez,

21    R-o-b-e-r-t-o, V-a-s-q-u-e-z.

22           THE COURT:  Thank you.  I ask you to slow down a

23    little bit when you speak.

24           THE WITNESS:  No problem.

25           THE COURT:  Mr. Samuel.

1   DIRECT EXAMINATION

2   BY MR. SAMUEL:

3   Q.  Good afternoon, Mr. Vasquez.

4   A.  Good afternoon.

5   Q.  What is your relation to Gloria Genao?

6   A.  That's my mom.

7   Q.  Okay.  And have you ever worked at Star Parking 2?

8   A.  Yes, I have.

9   Q.  And when, for the first time, did you work there?

10  A.  When they first opened it years ago.

11  Q.  Do you remember approximately what year?

12  A.  I believe 2015, 2014.  I'm not a hundred percent sure.

13  Q.  And what is your relationship to Gloria Genao?

14  A.  My mom.

15  Q.  And when you say you worked there, did you have a specific

16  shift that was assigned to you?

17  A.  Not a specific shift, but we used to -- I used to work a

18  lot in there, though.  Now, is that things are easing up,

19  easing out, but back then, I used to really work a lot.  If I

20  wasn't there, Kendrick, my little brother would be there.  She

21  would be there also.

22  Q.  When you say "she," who are you referring to?

23  A.  Excuse me.

24  Q.  When you say "she," who are you referring to?

25  A.  Gloria, my mom.

1   Q.  Now, let's narrow this to 2015.  Did you work in 2015?

2   A.  Yes.

3   Q.  And did you have a specific shift that was assigned to you?

4   A.  No, not a specific shift, but I used to -- the only days

5   that I could say that I used to really work a hundred percent

6   was Saturdays and Sundays.

7   Q.  Okay.  What about the weekdays, Monday to Friday?

8   A.  No.  I mean, I would work, but it wasn't like a hundred

9   percent.  Like, I would go in today or I would go in tomorrow.

10  But like me and my brother would go in, if I wasn't there, my

11  mom was there, if my mom wasn't there, then Kendrick would be

12  there.

13  Q.  Okay.  Did you split a shift, or did he predominantly work?

14  A.  Sometimes we'll be there together.  Sometimes he'll be

15  there.  Sometimes I'll be there.

16  Q.  And what time would the shift start?

17  A.  The morning, there's a morning shift that was from

18  7:00 a.m. to 2:00 p.m.

19  Q.  And who worked that shift?

20  A.  Monday through Friday?

21  Q.  Yes, in 2015.

22  A.  Roberto.

23  Q.  And are you referring to Roberto Herrera?

24  A.  Yes, sir.

25  Q.  Okay.  And who worked after his shift was over at

1    2:00 p.m.?

2    A.   Wait a second.  Let me see.  After 2:00 p.m., oh, my mom

3    would come in, but she would come in for like two hours, three

4    hours, the most.

5    Q.   And then who would take over for her?

6    A.   Kendrick will come in, and if Kendrick wouldn't come in,

7    then I would come in.

8    Q.   Okay.  What time would your shift go until?

9    A.   It's from 4:00 p.m. or 5:00 p.m. until like 11:00 p.m.,

10   11:30.

11   Q.   Okay.  So is it your testimony that Mr. Herrera only worked

12   the morning shift on Mondays through Friday, 7:00 a.m. until

13   around 2:00 p.m.?

14   A.   Yes, sir.

15            MR. SAMUEL:  Okay.  I have no further questions.

16            THE COURT:  Cross-examination?

17   CROSS-EXAMINATION

18   BY MR. LUCAS:

19   Q.   Are you known as Roberto Vasquez, Junior?

20   A.   Excuse me?

21   Q.   Are you Roberto Vasquez, Junior?

22   A.   Yes, sir.

23   Q.   And is Roberto Vasquez a -- one of the named defendants in

24   this case?  He is your father?

25   A.   Can you repeat that question for me, please.

1    Q.   Roberto Vasquez is your father?

2    A.   Yes.

3              MR. LUCAS:  No questions.

4              THE COURT:  Any redirect?

5              MR. SAMUEL:  No.

6              THE COURT:  Mr. Vasquez, you may step down.

7              (Witness excused)

8              Mr. Samuel, do you have any other witnesses?

9              MR. SAMUEL:  No other witnesses.

10             THE COURT:  So the defense rests?

11             MR. SAMUEL:  Yes.

12             THE COURT:  Mr. Lucas, do you have a rebuttal case?

13             MR. LUCAS:  No, your Honor.  Just before we wrap up

14   the proceedings, I just wanted to get a clear picture of the

15   exhibits that the defendant has offered, just to make sure that

16   I have a record.

17             THE COURT:  Yes, that would be a good thing because,

18   at some point along the way, not only did I lose track of what

19   exhibit was what number, but I also lost the exhibits that were

20   given to me.  So if the parties can agree on what was put into

21   evidence, or if you agreed that all of the things that were in

22   your binders are to be put in, let me know, but there were only

23   limited documents referred to in the testimony.

24             MR. LUCAS:  Plaintiff's binder is before your Honor,

25   but if the Court would give Mr. Samuel and I a few minutes, I'm

I2QPHERT                          R. Vasquez - Cross

1    sure we could figure out what his exhibits are, the defense

2    exhibits are.

3          THE COURT:  Well, you can do that.  You don't need me

4    to do that.  What we'll do is we'll finish up, and then you can

5    stay and determine what exhibits there are.  Let Ms. Rivera

6    know that, give her the exhibits.  In the meantime, did you

7    want to make motions?

8          MR. LUCAS:  I think your Honor had mentioned proposed

9    findings of facts and conclusions of law.

10         THE COURT:  When do you want to get those in?  How

11   much time do you want?

12         MR. LUCAS:  I guess we would need to order a

13   transcript, and so if the court reporter could tell me what the

14   normal turn around is for that.  Maybe 30 days after the

15   transcript comes in.

16         THE COURT:  Well, there is no normal turn around.

17   It's how much you're willing to pay; so you can get a

18   transcript by the end of today, or you can get a transcript in

19   a month, or I mean, I don't know what the terms are, but....

20         MR. LUCAS:  Would it be all right if we went off the

21   record for a moment to speak with the court reporter about the

22   transcript order?

23         THE COURT:  Sure, but do understand, she's in no

24   position to negotiate.

25         MR. LUCAS:  I understand.

1               THE COURT:  Okay.

2               (Discussion off the record)

3               MR. LUCAS:  Okay.  Your Honor, the parties have agreed

4     to order a regular transcript and to split the cost of that,

5     and that's a 30-day turn around.  So if the Court would allow

6     the parties 30 days from that, namely 60 days from today.  I

7     don't know about defense counsel, but I think that would be a

8     reasonable time to submit proposed findings of fact and

9     conclusions of law.

10              THE COURT:  Mr. Samuel?

11              MR. SAMUEL:  That sounds fine.

12              THE COURT:  Very well.  So we'll do that.

13              Ms. Rivera, do you want to give us a date two months

14    out?

15              THE DEPUTY CLERK:  Yes.  April 27th.

16              THE COURT:  Okay.  So is there anything else that we

17    need to do today, Mr. Lucas?

18              MR. LUCAS:  Are we going to waive closings?

19              MR. SAMUEL:  Yes.

20              MR. LUCAS:  The parties have agreed to waive closing.

21    So aside from figuring out the defense exhibits, I think we're

22    done.

23              THE COURT:  Very well.  Mr. Samuel, anything else from

24    your perspective?

25              MR. SAMUEL:  I have the exhibits here.  I can hand

I2QPHERT                          R. Vasquez - Cross

1    them up to the court reporter.  I had a binder.

2              THE COURT:  And you're agreed to the exhibits,

3    Mr. Lucas?

4              MR. LUCAS:  I haven't seen them.  If I could just take

5    a peek at them.

6              THE COURT:  I mean, I have the binder that was given

7    to me earlier.  Is this the binder that was given to me

8    earlier?

9              MS. COHEN:  Yes.

10             THE COURT:  Okay.  So I'm done.  So I'll leave it to

11   you guys to make sure that you have all the appropriate

12   exhibits.

13             MR. LUCAS:  Yes, thank you.

14             THE COURT:  Just make sure Ms. Rivera knows.  Okay.

15   Have a good day, everyone.

16             MR. LUCAS:  Thank you, your Honor.

17             MR. SAMUEL:  Thank you.

18             (Adjourned)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                          Page

MANUEL FERNANDO GUERRERO

Direct By Mr. Samuel . . . . . . . . . . . . . . 7

Cross By Mr. Lucas . . . . . . . . . . . . . . .12

ROBERTO HERRERA

Direct By Mr. Lucas  . . . . . . . . . . . . . .21

Cross By Mr. Samuel  . . . . . . . . . . . . . .47

Redirect By Mr. Lucas  . . . . . . . . . . . . .59

JAMIE RIJO-CONTRERAS

Direct By Mr. Lucas  . . . . . . . . . . . . . .60

Cross By Mr. Samuel  . . . . . . . . . . . . . .64

Redirect By Mr. Lucas  . . . . . . . . . . . . .67

MELISSA RODRIGUEZ

Direct By Mr. Lucas  . . . . . . . . . . . . . .70

Cross By Mr. Samuel  . . . . . . . . . . . . . .74

ALVARO VARGAS

Direct By Mr. Lucas  . . . . . . . . . . . . . .78

Cross By Mr. Samuel  . . . . . . . . . . . . . .80

GLORIA GENAO

Direct By Mr. Samuel . . . . . . . . . . . . . .83

Cross By Mr. Lucas . . . . . . . . . . . . . . 104

KENDRICK VASQUEZ

Direct By Mr. Samuel . . . . . . . . . . . . . 113

Cross By Mr. Lucas . . . . . . . . . . . . . . 117

1   ROBERTO VASQUEZ

2   Direct By Mr. Samuel . . . . . . . . . . . . 120

3   Cross By Mr. Lucas . . . . . . . . . . . . . 122