UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERTO HERRERA,

                Plaintiff,

     – against –

GLORIA GENAO, ROBERTO VASQUEZ,
STAR PARKING GARAGE, INC., and
STAR PARKING 2,

               Defendants.

**OPINION AND ORDER**

16 Civ. 4297 (ER)

Ramos, D.J.:

      Plaintiff Roberto Herrera ("Plaintiff" or "Herrera") brought this action for violations of

the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), New York Labor Law §§ 190 *et*

*seq.* and 650 *et seq.* ("NYLL"), and orders of the New York Commissioner of Labor codified at

N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.4(a) (2009). *See* Compl. (Doc. 1). The

Defendants are Gloria Genao ("Genao"), Roberto Vasquez ("Vasquez"), Star Parking Garage,

Inc., and Star Parking 2 ("Star Parking"). A bench trial was conducted by this Court on February

26, 2018. This Opinion constitutes the Court's findings of fact and conclusions of law on

whether Defendants willfully violated labor laws and the proper measure of damages, if any.

**I.     BACKGROUND**

      On June 9, 2016, Plaintiff brought this action for unpaid minimum wages and overtime

pursuant to the FLSA and NYLL and the "spread of hours" and overtime wage orders of the

New York Commissioner of Labor. *See* Compl. (Doc. 1); Joint Pre-Trial Order ("JPTO") (Doc.

16), at 2. Plaintiff also seeks liquidated damages, interest, attorneys' fees, and costs. JPTO at 7.

      Herrera alleges that for most of his employment at Star Parking, he worked for twelve

hours a day, seven days per week. Tr. (Doc. 18) at 22:16, 25:6–11, 49:6–11. Despite this, he

was paid only $490 per week.  *Id.* 51:2–4.  Defendants state that Herrera actually only worked

seven hours per day, five days per week, and was paid $325 per week.  *Id.* at 84:11–85:17,

89:22–90:5, 102:7–19.  Herrera also alleges that he never received wage notices; Defendants

state that they provided a sheet that listed each of their employees and the corresponding wages

for the week and asked the employees to sign when they received pay.  *Id.* at 44:25–45:21,

87:22–89:19.

At the bench trial, Herrera and Genao appeared and were cross-examined.  Plaintiff also

called Jaime Rijo-Contreras ("Rijo-Contreras"), Melissa Rodriguez ("Rodriguez"), and Alvaro

Vargas ("Vargas").  Defendants called Manuel Fernando Guerrero ("Guerrero"), Kendrick

Vasquez ("Kendrick"), and Roberto Vasquez ("Robertico").

## II.     FACTS

### A.      Undisputed Facts

From January 2015 through February 28, 2016, Herrera was employed primarily as an

attendant at Star Parking, a parking lot licensed by the New York City Department of Consumer

Affairs.  *See* JPTO at 4–5.[1]  Defendants Genao and Vasquez were the joint owners of Star

Parking.  *Id.* at 4.  Genao was an officer of Star Parking.  *Id.* at 5.

The parties also stipulated to the admission of trial exhibits.  Tr. at 69:15–21.

Defendants' Exhibit 1 is a copy of the Plaintiff's disclosures pursuant to Rule 26(a)(1)(A) of the

Federal Rules of Civil Procedure.  Defendants' Exhibit 2 (which is also Plaintiff's Exhibit 3) is a

form titled "Notice and Acknowledgement of Pay Rate and Payday" in both English and

Spanish.  The pay rate on the form is listed as $9.00 and the overtime pay rate is listed as $13.50.

It is signed by "Robeto H.R." and dated February 23, 2015.

---

[1] Defendant Star Parking Garage, Inc., has been voluntarily dismissed from the case.  *See* Tr. at 82:11–19.

Defendants' Exhibit 3 is a document listing the name and pay of Star Parking 2 employees per week. There are eight columns: (1) name; (2) hours; (3) hourly rate; (4) overtime rate; (5) amount paid; (6) pay date; (7) week worked; and (8) signature. Herrera's name first appears on the exhibit on January 25, 2015; according to the exhibit, he worked thirty-six hours that week and was paid $325. In general, the spreadsheet shows that each week, Julio (another employee at Star Parking) and Herrera each worked for 36 hours and earned $325. The spreadsheet also shows Alvaro Vargas receiving payment in lieu of Herrera on June 14, 2015, and Fernando Guerrero receiving payment in lieu of Herrera on November 15, 2015, November 22, 2015, and November 30, 2015. Beginning on December 16, 2015, Herrera, Guerrero, and Julio are all listed each week as receiving payment for 36 hours of work. However, there are inconsistencies throughout the document.[2]

Defendants' Exhibit 4 was never discussed at trial; however, it appears to be a screenshot of an individual's transaction history on the website xoom.com. Herrera's name is listed next to a transaction number and the date November 13, 2015. The amount of that transaction appears to have been $465.00.

Defendants' Exhibit 5 is a handwritten log that contains a date, an employee name, and a dollar figure on each row. The log spans from December 23, 2013 to January 31, 2016. Herrera's name first appears on January 22, 2015, and the log indicates that he worked every day

---

[2] For example, there are entries missing for the weeks of December 7, 2014, December 14, 2014, December 21, 2014, January 11, 2015, January 18, 2015, and November 1, 2015. There are also no entries between February 22, 2015 and May 17, 2015. For February 1, 2015 February 15, 2015, May 17, 2015, and September 13, 2015, Julio is listed as receiving payment twice. On May 24, 2015, Herrera is listed as receiving payment twice. On June 28, 2015, July 5, 2015, and July 12, 2015, Julio's signature appears on rows for the employee name "Roberto," and Herrera's signature appears on the rows for "Julio." On December 20, 2015, Guerrero is listed as receiving payment twice, and Herrera not at all. For the weeks of February 7, 2016 and February 14, 2016, only Herrera and Julio are listed as having received payment.

through the end of the month.  There are no entries between February 1, 2015 and November 22, 2015, but the log covers the period between November 23, 2015 and January 21, 2016.  In the last week of November, the log indicates that Herrera worked three times.[3]  In the month of December 2015, the log indicates that Herrera worked eighteen days.[4]  In the month of January 2016, the log indicates that Herrera worked on seventeen days.[5]

Defendants' Exhibits 6, 7, 8, and 9 were also not discussed at trial.  Defendants' Exhibit 6 is a handwritten document listing hours worked for Guerrero, Julio, and Herrera in December 2015 and January 2016.  For each week, Guerrero and Herrera are listed as having worked 36 hours at an hourly rate of $9, and Julio is listed as having worked 37 hours at the same rate.  Defendants' Exhibits 7 and 8 show Star Parking's tax returns for 2014 and 2015, respectively.  Defendants' Exhibit 9 shows the parking lot license for Star Parking.

Plaintiff's Exhibit 1 is a photograph of a spreadsheet that looks identical to Defendants' Exhibit 3.  However, in Plaintiff's Exhibit 1, only the last two columns (the date and signature columns) are filled out.  The other columns (like the hours, rate, and amount paid columns) are blank.  Plaintiff's Exhibit 2 is the page from Defendants' Exhibit 3 that matches the dates in Plaintiff's Exhibit 1, and shows the spreadsheet for those dates in which all of the columns are filled out.  Plaintiff's Exhibit 4 is a spreadsheet illustrating Plaintiff's damages calculations.

---

[3] Herrera's name is not listed between November 23 and 26, 2015 and on November 30, 2015.

[4] Herrera's name is not listed on  December 7, 2015, December 8, 2015, December 11, 2015, December 16, 2015, December 18, 2015, December 20, 2015, December 21, 2015, December 23, 2015, December 24, 2015,[4] December 26, 2015, December 27, 2015, December 28, 2015, and December 30, 2015.  The name in one of the rows for December 4, 2015 is illegible.  Herrera's name is also listed twice on December 25, 2015.

[5] Herrera's name is not listed on January 3, 2016, January 4, 2016, January 5, 2016, January 6, 2016, January 8, 2016, January 10, 2016, January 11, 2016, January 13, 2016, January 14, 2016, January 16, 2016, January 17, 2016, January 18, 2016, January 19, 2016, and January 21, 2016.

### B.      Trial Testimony

#### 1.      Roberto Herrera

Herrera interviewed for a position at Star Parking in January 2015.  Tr. at 22:5–11.[6]  He

was interviewed by a parking lot attendant, Julio, and Genao.  *Id.* at 22:12–13.  According to

Herrera, he was informed that he would work seven days a week, twelve hours a day (from 8:00

a.m. to 8:00 p.m.), and would be paid $490 per week.  *Id.* at 22:14–21.  When he began work,

Genao trained him on processing credit card payments and filling out parking tickets for

customers.  *Id.* at 23:3–9.  Herrera testified that he worked the 8:00 a.m. to 8:00 p.m. shift and

Julio worked the 8:00 p.m. to 8:00 a.m. shift every day.  *Id.* at 25:6–11, 35:1–20.  When Herrera

was working, he was the only person parking and retrieving cars at the lot.  *Id.* at 31:24–32:1.

Herrera never saw either Genao or her sons park cars at the lot.  *Id.* at 31:10–15.[7]  They would

occasionally come to the lot, but they would collect the week's payments and pay out wages;

they would not assist in parking cars or operating the lot.  *Id.* at 31:16–23.[8]  On Sundays, before

receiving his pay, Herrera was required to sign a sheet of paper.  *Id.* at 42:12–16, 46:19–20.  The

first six columns of those sheets were left blank when Herrera signed it.  *Id.* at 43:1–13.  Herrera

was paid $490 per week in cash.  *Id.* 51:2–4.  He never received a wage notice from Star

Parking.  *Id.* at 44:25–45:4.  Herrera was shown Defendants' Exhibit 2, a document titled

"Notice and Acknowledgement of Pay Rate and Payday," which was purportedly signed by him

---

[6] According to Herrera, the lot usually held 52 cars.  *Id.* at 32:8–33:2.  He also, on rare occasions, parked customers' cars on the street if there were a snowstorm and the lot could not hold all of the regular monthly customers' cars.  *Id.* at 33:3–9.

[7] Genao's sons are Kendrick Vasquez ("Kendrick") and Robert Vasquez, Jr. ("Robertico").  Tr. at 113:5–15, 120:13–21.

[8] On two occasions, however, he saw a nephew of Genao's working as a parking attendant on the lot during the evening shift; Herrera presumed that the nephew was working as a substitute for Julio on those nights.  *Id.* at 34:5–21.

on February 23, 2015.  Herrera testified, however, that he had never seen the document, had never signed it, and that the signature could not have been his, because his name was misspelled "Robeto."  *Id.* at 45:5–21.

In 2015, Herrera went to the Dominican Republic for a trip from November 10 to November 25.  *Id.* at 23:21–24:6.[9]  Guerrero worked as a substitute for Herrera during Herrera's trip; however, Guerrero had previously worked as a substitute for Herrera on a handful of occasions.  *Id.* at 24:15–24:21, 51:20–25.  When Herrera returned from the Dominican Republic, he told Genao that he could no longer work such a demanding schedule.  *Id.* at 25:12–24.  Genao told Herrera that if he found and trained someone, that would be fine.  *Id.*  Herrera found Alvaro Vargas.  *Id.* at 26:2–5.  After Vargas trained with Herrera for a week, he worked one shift of Herrera's and one shift of Julio's.  *Id.* at 26:6–22.  Herrera and Julio each paid Vargas for the shift of theirs he covered; the amount they earned from Genao was unchanged after Vargas began working.  *Id.* at 27:2–28:3.[10]  Other than that, Herrera did not take any substantial time off during his employment.  *Id.* at 28:4–12.  On the occasions where he took a few hours off, he would ask Manuel Fernando Guerrero to cover for him.  *Id.* at 28:10–23.  Guerrero also covered some of Julio's shifts after Julio became ill, which happened shortly before Herrera left Star Parking.  *Id.* at 36:8–23.

### 2. Jaime Rijo-Contreras

Rijo-Contreras is a taxi and Uber driver; in 2015 and 2016, he would park his car at Star Parking.  Tr. at 61:3–6, 61:16–22.  Rijo-Contreras would retrieve his car from the lot six or seven

---

[9] When he made that trip, Genao loaned him $500, which Herrera stated that he paid back in $100 increments weekly.  Tr. at 56:6–18.  Genao also sold Herrera a car for $2,800, which Herrera also paid back in $100 or $150 increments.  Tr. at 56:19–57:21.

[10] Herrera did not mention this in the Complaint.  *Id.* at 53:22–54:22.

days a week at 8:00 a.m.; Herrera was always the attendant who would bring it out to him. *Id.* at 62:3–12. Rijo-Contreras would generally work a twelve hour day and then drop his car off at 8:00 p.m.; Herrera was the attendant who parked his car. *Id.* at 62:20–22. Occasionally, especially on weekends, Rijo-Contreras would work a later shift, picking his car up in the afternoon and driving through most of the night. *Id.* at 62:13–63:8. Herrera would usually retrieve his car in the early afternoon, and either Herrera or Julio would be there at night when Rijo-Contreras dropped his car off. *Id.* at 63:20–64:6. Rijo-Contreras also recalled seeing another attendant working at the lot approximately two or three times per month. *Id.* at 66:4–10.

### 3. Melissa Rodriguez

Rodriguez met Herrera in May 2015 when she began parking her car at Star Parking. Tr. at 70:19–71:3. Rodriguez would typically retrieve her car every day at 8:00 a.m. and park her car between 7:00 p.m. and 9:00 p.m. *Id.* at 71:4–10. Herrera was usually the attendant who assisted her, although she also frequently saw Julio working. *Id.* at 71:11–19. Herrera and Rodriguez began dating in June 2015, and in July 2015, he moved into her apartment. *Id.* at 72:3–12.[11] Rodriguez began visiting the lot even more frequently to bring Herrera breakfast and lunch. *Id.* at 72:15–21. She saw Genao at the lot on two occasions, but never saw her or her sons parking cars. *Id.* at 72:22–25, 76:4–7. Rodriguez also recalled seeing Vargas working on the lot once or twice a week during January and February 2016, *id.* at 73:3–9, and Guerrero working while Herrera was on vacation and when Julio became sick. *Id.* at 73:12–21.

### 4. Alvaro Vargas

Vargas began working at Star Parking in December 2015. Tr. at 78:9–13. Vargas began covering one daytime shift and one evening shift per week. *Id.* at 78:19–24. Vargas confirmed

---

[11] Herrera and Rodriguez have since separated. *Id.* at 74:10–11.

that each shift was twelve hours long. *Id.* at 79:3–9. Vargas was paid $70 per shift. *Id.* at 79:14–18. Vargas never saw Genao or one of her sons parking cars at the lot. *Id.* at 79:22–25.

### 5. Gloria Genao

Genao is the owner of Star Parking. Tr. at 83:17–18.[12] Genao hired Herrera in January 2015; she testified that he was only hired to work the morning shift, which she described as from 7:00 a.m. to 1:30 p.m. or 2:00 p.m. *Id.* at 84:11–85:6. According to Genao, Herrera only worked that shift on weekdays. *Id.* at 85:9–17. Between 1:30 p.m. and 2:00 p.m., either Genao or one of her sons would come to the lot to take over as parking attendant. *Id.* at 85:18–21. Most often, Kendrick would work as parking attendant during those hours. *Id.* at 85:18–86:8. If Genao was working, she would stay only for a few hours, and then her son Robertico would work as an attendant until 11:00 p.m. or 12:00 a.m. *Id.* at 86:12–24.

Genao testified that when employees began working at Star Parking, she provided them with a wage notice that explained their hours and hourly wage rate. *Id.* at 87:14–88:12.[13] She specifically remembered providing Herrera with the notice and watching him sign it. *Id.* at 88:22–89:17 (discussing Defendants' Exhibit 2). Genao also used a "sign-in sheet" that employees signed when they received their weekly pay, which contained a log of that employee's hours and wages for the week, including any overtime. *Id.* at 99:2–22 (discussing Defendants' Exhibit 3); *see also* Defs,' Ex. 3. Genao testified that she regularly filled out the information before her employees signed the sheet. *Id.* at 100:9–11. On one occasion, Genao was out of the country and left the wage sheet for her son to manage. *Id.* at 100:17–23. Afraid

---

[12] Vasquez also used to be a part owner and owned Star Parking during the times relevant to this litigation. *Id.* at 83:19–21.

[13] According to Genao, the pay rate in 2015 was $9 per hour. *Id.* at 89:22–90:5. Herrera was therefore paid $325 per week, because he worked 36 hours per week. *Id.* at 102:12–103:9.

he would make a mistake, Genao told him to have the employees sign the sheet without filling out any other information.  *Id.*  Genao stated that Plaintiff's Exhibit 1, the blank wage sheet, was the only time employees signed an otherwise blank sheet.  *Id.*  Genao explained that although she paid Kendrick and Robertico, she did not make them sign the sheet because they are her sons. *Id.* at 101:6–11.

Genao would also keep a record of the money each employee made for Star Parking that day.  *Id.* at 90:22–91:14 (discussing Defendants' Exhibit 5).  Genao stated that the record included the names of all of the attendants that worked that day, but also stated that she did not include herself or her sons when they worked at the lot.  *Id.* at 91:15–92:5.[14]  Genao explained that keeping a record of her income was important because she had to accurately report that income to the IRS.  *Id.* at 106:24–107:8.  When asked why she did not include the income she and her sons collected, Genao stated that she had another record for her accountant (which was not produced to the Court) that included income collected by her employees, her sons, and herself.  *Id.* at 107:9–108:12.  The record produced to the Court was also missing all entries from January 12, 2015 to November 23, 2015.  *Id.* at 105:22–106:16.[15]

---

[14] Genao also reviewed specific dates in her record of employee earnings.  She explained that Herrera was not listed in the entry for November 24, 2015 because he was out of the country.  *Id.* at 93:5–10.  Instead, she, Kendrick, Julio, and Guerrero worked.  *Id*.  On December 7, 2015, Herrera did not work because it was a weekend.  *Id.* at 93:14–20. Instead, Guerrero worked on that day.  *Id.*  Herrera also did not work on December 20, 2015 or December 21, 2015. *Id.* at 94:1–12.

[15] Genao stated that she had records for the missing months, but that her attorney only copied certain portions of her record book.  *Id.* at 106:14–18.

Genao testified that she did not know Vargas, and that she had never hired Vargas. *Id.* at 103:13–17. She testified that when Herrera left Star Parking, Guerrero took over his shift and works from 7:00 a.m. to 2:00 p.m. *Id.* at 103:24–104:3.[16]

### 6. Manuel Fernando Guerrero

Guerrero is a current parking attendant at Star Parking. Tr. at 7:5–19. Guerrero initially began working as a substitute for Herrera, including during Herrera's trip to the Dominican Republic. *Id.* at 8:11–9:4, 12:15–13:7.[17] Guerrero testified that Herrera introduced him to Genao and Guerrero began to work on Saturdays and Sundays. *Id.* at 7:20–8:1, 9:10–14. When Guerrero began working in 2015, he earned $12.50 per hour. *Id.* at 10:11–15. On those weekends, Guerrero would take the shift following Julio's. *Id.* at 17:6–12. Gerrero believed that Julio's shift was from midnight to 7:00 a.m. *Id.* at 17:8–12. After his shift, Kendrick would work at the lot. *Id.* at 19:5–21. Kendrick would work from 2:00 p.m. to 7:00 or 11:00 p.m. *Id.*

When Herrera left Star Parking, Guerrero began working on weekdays from 7:00 a.m. to 2:00 p.m. *Id.* 10:11–11:20. He also began earning $13.50 per hour. *Id.* According to Guerrero, Herrera previously was responsible for that shift, and was scheduled to work only five days a week, from 7:00 a.m. to 1:00 p.m. *Id.* at 9:22–10:5. Guerrero's shift was also preceded by Julio's and followed by Kendrick's. *Id.* at 12:1–7, 17:6–12. According to Guerrero, Genao would also occasionally work at the lot for two or three hours in the afternoon. *Id.* at 12:1–7.

---

[16] Genao also testified that she lent Herrera $500, which he never paid back. *Id.* at 96:1–15. According to her, Herrera also never fully paid off the car he bought from her. *Id.* at 97:4–17. Although she did not remember what he paid, she believed he paid her less than $2,000. *Id.*

[17] When Guerroro worked as Herrera's substitute, Herrera, not Genao, paid his wages for the day. *Id.* at 9:3–4.

Guerrero further testified that he never received a written wage notice, but that Genao would tell him what his wages would be when he started working. *Id.* at 17:21–25. He was also paid by check. *Id.* at 18:4–7.

### 7. Kendrick Vasquez

Kendrick, Genao's son, testified that he has worked at Star Parking since 2015. Tr. at 113:5–15. Kendrick has never been assigned a particular shift at the lot. *Id.* at 113:16–17. However, he stated that there was an afternoon shift, from 5:00 p.m. to 12:00 a.m., that he, his brother Robertico, and Genao would split. *Id.* at 113:16–114:2.[18] According to Kendrick, Genao also parked cars from 2:00 p.m. to 4:00 p.m., and Kendrick occasionally accompanied her, but did not work during that time. *Id.* at 114:3–11. Kendrick recalled that Herrera worked on weekdays between 7:00 a.m. and 2:00 p.m, *id.* at 114:17–21, and Julio worked from 12:00 a.m. to 7:00 a.m. *Id.* at 115:1–8. Kendrick recalled that on one instance, Genao was out of the country and left envelopes with cash and a piece of paper for her employees. *Id.* at 115:17–116:5. Kendrick did not know what was on the paper, but knew the employees were required to sign a sign-in sheet upon receiving their pay. *Id.* at 116:6–10. Kendrick also recalled seeing substitutes for Herrera at Star Parking on three or four occasions; he recalled seeing Guerrero and at least one other individual. *Id.* at 116:16–21, 117:3–9.

### 8. Roberto Vasquez

Robertico, Genao's eldest son, also worked at Star Parking, although he did not work a specific shift. *Id.* at 120:13–21. Robertico testified that he could only recall consistently working Saturdays and Sundays in 2015. *Id.* at 121:3–6. However, he also testified that during the weekday, either he, Kendrick, or Genao would always be working at the lot, sometimes

---

[18] Kendrick was also attending high school during this time; he graduated in June 2017. *Id.* at 117:17–118:6.

together. *Id.* at 121:7–15. Robertico recalled that Herrera worked the morning shift at Star Parking in 2015, which was on weekdays from 7:00 a.m. to 2:00 p.m. *Id.* at 121:16–24. Genao would then work from 2:00 p.m. to 4:00 p.m. or 5:00 p.m., and either Kendrick or Robertico would work from then until 11:00 pm. or 11:30 p.m. *Id.* at 121:25–122:10.

### C. Findings on Disputed Issues of Fact

#### 1. Hours Worked by Herrera

The Court credits Herrera's testimony that he generally worked twelve hour shifts seven dates a week. The Court found the testimony of Rijo-Contreras and Rodriguez, that they saw Herrera at the lot when they picked up their cars around 8:00 a.m., and again when they dropped their cars off in the evening, to be credible. Tr. at 62:3–22, 71:4–10. The Court also notes little incentive for either Rijo-Contreras, who only saw Herrera socially on one occasion and who was subpoenaed to attend trial,[19] or Rodriguez, who ended her romantic relationship with Herrera,[20] to provide biased testimony in Herrera's favor. Further, the fact that only two names—Herrera's and Julio's—were generally listed on Genao's employee logs also supports this finding. *See* Defs.' Ex. 3, Defs.' Ex. 5.

By comparison, the testimony of Genao, Guerrero, Kendrick, and Robertico that Herrera worked only seven hours per day, five days per week, was not as credible in light of their conflicting testimony and the documentary evidence before the Court.

First, as stated above, this testimony is contradicted by Defendants' Exhibits 3 and 5. Both exhibits indicate that during most weeks, only two or three employees—usually Julio and Herrera—worked at Star Parking. Although Defendants' Exhibit 3 indicates that Julio and

---

[19] Tr. at 67:11–23.

[20] Tr. at 74:10–11.

Herrera each only worked 36 hours, the Court credits Plaintiff's argument that the "hours" listed on the spreadsheet were not contemporaneous reflections of hours worked but instead were filled out after the fact. Herrera's testimony that he consistently signed only a blank spreadsheet is corroborated by the photograph he took of the blank spreadsheet[21] as well as inconsistencies in the spreadsheet itself—for example, the fact that there are no entries for several weeks despite the fact that the parking lot was open year-round or that in certain places Herrera signed on the row that should have reflected Julio's weekly pay, and Julio signed on the row that should have reflected Herrera's pay. Based on the evidence before the Court, it is clear that most of the information in Defendants' Exhibit 3 was filled out at some point after employees signed the document and therefore it should not be relied on as a contemporaneous log of Herrera's hours. The Court finds it likely that the hours listed on this document were fabricated by Defendants after the commencement of this litigation.

Defendants' attempts to explain away these inconsistencies were unavailing. Defendants asserted that although only two non-relative employees worked per day, Genao, Kendrick, and Robertico would work as parking attendants on duty ten hours per day, and Julio and Herrera would only work for seven hours. *E.g.*, Tr. at 85:18–86:24, 113:16–114:2, 121:7–15. But not only are there no wages attributed to Kendrick and Robertico during 2015 and 2016 in Defendants' Exhibit 3, they are also not associated with any income earned for the lot during the same time period in Defendants' Exhibit 5. Genao stated that she kept separate income records

---

[21] Genao stated that the spreadsheet was only blank during that time period (December 13, 2015 to February 7, 2016) because she was out of the country. Tr. at 100:12–23. But Genao later testified that she could not recall when she as out of the country during that time period; she suggested that she was "in and out" of the United States between the end of November 2015 and the end of January 2016. *Id.* at 111:3–9. These dates are not coextensive with the dates in Plaintiff's Exhibit 1, undermining Genao's explanation that the dates captured in Herrera's photograph were, by coincidence, the only dates in which employees were asked to sign a blank spreadsheet.

for the parking income earned by her sons, Tr. at 90:22–91:14; this, however, is undermined by the fact that Robertico is listed as responsible for parking lot income at several points in 2014. *See* Defs.' Ex. 5 at 13–17.  Defendants' Exhibit 5 also indicates that Herrera regularly worked on weekends, despite defense witnesses' contentions that he only worked on weekdays.  *See* Defs.' Ex. 5 at 27.[22]

Further, although defense witnesses consistently testified that Herrera only worked from 7:00 a.m. to 2:00 p.m. on weekdays, they were somewhat less consistent when describing how the remainder of the shifts were split.  Genao testified that either she, Kendrick, or Robertico would arrive at the lot by 1:30 p.m—most often Kendrick.  Tr. at 85:1–6.  If one of her sons arrived, they would work until 11:00 p.m. or midnight.  *Id.* at 86:12–15.  If she arrived, she would work for a few hours, and then one of her sons would work the remainder of the shift.  *Id.* at 85:18–86:24.  Guerrero testified that Kendrick would take the 2:00 p.m. shift and either stayed until 7:00 p.m. or 11:00 p.m.  *Id.* at 86:12–15.  However, he added that Genao would occasionally work for a few hours in the afternoon.  *Id.* at 9:22–10:5, 12:1–7.  Kendrick, by contrast, stated that he never had a consistent shift at Star Parking.  *Id.* at 113:16–17.  Instead, he testified that Genao always worked from 2:00 p.m. to 4:00 p.m., and that Kendrick, Robertico, and Genao would split the 5:00 p.m. to 12:00 a.m. shift.  *Id.* at 113:16–114:11.  Robertico also testified that he did not work a particular shift, and could not recall consistently working at Star Parking.  *Id.* at 120:13–21.  But Robertico also told the Court that he consistently worked weekends in 2015; then he recalled that during the weekdays, either he, Kendrick, or Genao

---

[22] According to Defendants' Exhibit 5, Herrera worked the following Saturdays and Sundays:  1/24/2015, 1/25/2015, 1/31/2015, 11/28/2015, 11/29/2015, 12/05/2015, 12/06/2015, 12/12/2015, 12/13/2015, 12/19/2015, 1/2/2016, 1/9/2016, 1/23/2016, 1/24/2016, 1/30/2016, 1/31/2016, 2/6/2016, 2/7/2016, 2/13/2016, 2/14/2016, 2/20/2016, and 2/21/2016.

would always be at the lot, sometimes together.  *Id.* at 121:3–15.  After further questioning,

Robertico seemed to recall that Genao would work from 2:00 p.m. to 4:00 p.m or 5:00 p.m. on

weekdays, and either he or Kendrick would work from then until 11:00 p.m. or 11:30 p.m.  *Id.* at

120:13–122:10.  No defense witnesses ever fully explained how shifts were split on weekends.

### 2.  Wage Notices

The Court also finds that Herrera never received a wage notice from Star Parking or

Genao.  Herrera and Guerrero both testified that they never received wage notices from Star

Parking.  Tr. at 17:21–18:3, 44:25–45:4.  Defendants put forward Defendants' Exhibit 2, a form

titled "Notice and Acknowledgement of Pay Rate and Payday" and ostensibly signed by Herrera

on February 23, 2015.  *See* Defs.' Ex. 2.  But Herrera testified that he had never seen, much less

signed, that piece of paper.  Tr. at 45:5–21.  The name on the signature line was also misspelled

"Robeto" rather than "Roberto."  *Id.*   The Court finds it unlikely that Herrera would misspell his

own name and concludes that Herrera was never presented with a wage notice.  It therefore

concludes that Defendants' Exhibit 2, like Defendants' Exhibit 3, was fabricated by Defendants.

## III.  DISCUSSION

### A.  Jurisdiction

An employee is only covered by the FLSA's minimum wage and overtime provisions if

he is personally "engaged in commerce or in the production of goods for commerce" or if he is

"employed in an enterprise engaged in commerce or in the production of goods for commerce."

29 U.S.C. §§ 206(a), 207(a)(1).  Plaintiff concedes that there is no enterprise jurisdiction.  *See*

Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. 20), ¶ 65.  Thus, he is

operating solely under the "'individual coverage' theory" and must establish that he was

"performing work involving or related to the movement of persons or things . . . among the

several States or between any State and any place outside thereof." *Owusu v. Corona Tire Shop, Inc.*, No. 09 Civ. 3744 (NGG) (JO), 2010 WL 4791629, at *2 (E.D.N.Y. Nov. 17, 2010) (quoting 29 C.F.R. § 779.103). "Activities that 'simply affect or indirectly relate to interstate commerce' are insufficient to plead individual coverage." *Jones v. SCO Family of Servs.*, 202 F. Supp. 3d 345, 351 (S.D.N.Y. 2016) (quoting *Li v. Zhao*, 35 F. Supp. 3d 300, 308 (E.D.N.Y. 2014)). For jurisdiction under the individual coverage theory to lie, a "substantial part" of the employee's work must relate to interstate commerce. *Owusu*, 2010 WL 4791629, at *2.

Plaintiff argues that individual coverage lies because "Herrera's work as a parking lot attendant caused cars to be both removed from and placed into the flow of traffic, which necessarily had an impact on local traffic, and by extension, interstate commerce." Doc. 20 ¶ 66. The two cases Plaintiff cites in support of this contention are from the Southern District of Florida and the Eastern District of Louisiana; moreover, both are inapposite. In *Montoya v. L.C. 1 Trucking Corporation*, the Southern District of Florida found an issue of fact as to individual coverage jurisdiction after the plaintiff put forward evidence that the trucks parked in the lot in question were mostly driven "across state lines to and from destinations outside the state of Florida" and that the parking lot owners also owned trucks that "shipped materials across the country to New York, New Jersey, and Illinois." No. 12 Civ. 23816 (BSS), 2013 WL 5007621, at *3 (S.D. Fla. Sept. 12, 2013). In *Murillo v. Coryell County Tradesmen, LLC*, the Eastern District of Louisiana declined to dismiss the plaintiffs' claims under the individual coverage theory because they alleged that they were "largely migrant workers" who "traveled to New Orleans from different parts of the country and were renovating a luxury hotel and apartment building while being employed by several interstate construction companies." No. 15 Civ. 3641 (NJB), 2017 WL 1133113, at *4, *9 (E.D. La. Mar. 27, 2017). Herrera is not a migrant worker,

Star Parking is not an interstate company, and Plaintiff has put forward no evidence that the cars parked in the lot were engaged in interstate commerce. There is simply nothing in the record before the Court that would allow it to conclude that Plaintiff is covered by the FLSA.

That does not, however, deprive the Court of jurisdiction over Plaintiff's claims. 28 U.S.C. § 1367(a) provides for supplemental jurisdiction over state law claims that "derive from a common nucleus of operative fact," as Plaintiff's NYLL claims do. A district court may decline supplemental jurisdiction if it has dismissed "all claims over which it has original jurisdiction." *Salustio v. 106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 551–52 (S.D.N.Y. 2017). However, in so doing, a court should also consider whether dismissal would promote or hinder the values articulated in *United Mine Workers of America v. Gibbs*: economy, convenience, fairness, and comity. *Id.* (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)). Here, the Court finds that dismissal would be inefficient and inconvenient at this late stage. *See id.* (declining to dismiss NYLL claims after a bench trial); *Marcelino v. 374 Food, Inc.*, No. 16 Civ. 6287 (KPF), 2018 WL 1517205, at *11 (S.D.N.Y. Mar. 27, 2018) (same).

### B.    Minimum Wage Claims

Under the NYLL, an employee is entitled to be paid a minimum wage for his labor; the minimum wage rate was set at $8.75 in 2015 and $9.00 in 2016. *See* N.Y.L.L. § 652(1); 21 N.Y.C.R.R. § 146-1.2. When an employer's payroll records are inaccurate or incomplete, the employer bears the burden "of proving that the complaining employee was paid wages, benefits, and wage supplements." *Marcelino*, 2018 WL 1517205, at *18 (quoting NYLL § 196-a(a)). When an employer has not met that burden, a plaintiff must proffer "sufficient evidence from which violations of the [FLSA and NYLL] and the amount of an award may be reasonably

inferred." *Id.* at *16 (quoting *Gonzalez v. Masters Health Food Serv. Inc.*, 14 Civ. 7603 (VEC), 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017)).

The Court finds that Defendants' records were inaccurate (as in the case of Defendants' Exhibit 3) or incomplete (as in the case of Defendants' Exhibit 5); therefore, Defendants have not met their burden of proving that Herrera was paid minimum wage for the first forty hours per week he worked during his employment at Star Parking. Herrera testified that before he went to the Dominican Republic in November 2015, he worked eighty-four hours per week, and was only paid $490 per week. Tr. at 22:14–21, 51:2–4. When he returned, he worked fewer shifts; however, he typically received pay as if he had worked all seven shifts and was expected to pay Vargas for twelve hours of pay. *Id.* at 27:2–28:3. Plaintiff argues that the Court should credit Defendants' Exhibit 5, to the extent that those logs exist, and infer that on each day on which Herrera's name is listed, he worked a twelve-hour shift. *See* Doc. 20 ¶ 93. Plaintiff also argues that he did not work on June 21, 2015, because Vargas signed Genao's pay spreadsheet that day. *Id.* The Court finds that Plaintiff's proposed calculations are based on "sufficient evidence from which violations of the [NYLL] may be inferred." Therefore, the Court adopts the damages calculation contained in Plaintiff's Proposed Findings of Fact and Conclusions of Law and finds that Herrera is entitled to $6,690 in unpaid minimum wage. *See* Doc. 20 ¶ 95.

### C.  Overtime Wage Claims

New York law also requires employers to provide overtime pay, a wage that is 50% higher than minimum wage, for hours worked in excess of forty hours per week. *See* 12 N.Y.C.R.R § 142-2.2. An employee may also be entitled to "spread of hours" pay. *Id.* at 142-2.4. An employee's spread of hours is the length between the beginning and end of the workday. *Id.* at 142-2.18. When an employee's spread of hours is greater than ten, his employer must pay

him for one additional hour at the minimum wage rate. *Id.* at 142-2.4. For the reasons discussed above, the Court finds that Defendants have failed to meet their burden to show that they paid Herrera for any overtime hours he worked. Because Plaintiff has put forward evidence (in the form of his testimony and that of Rijo-Contreras, Rodriguez, and Vargas) that he generally worked greater than ten hours per day and forty hours per week, the Court finds in favor of Plaintiff on his fourth and fifth claims.

With respect to the amount of the award that is appropriate, the Court finds that Plaintiff's calculations, based on Herrera's testimony of his wages (supported by Vargas' testimony that he earned $70 for one twelve-hour shift) and hours and days worked (corroborated, where possible, by Defendant's Exhibit 5) are based on sufficient evidence. The Court therefore finds that Herrera is entitled to $15,109 in unpaid overtime wages and $3,184 in unpaid spread of hours wages. Doc. 20 ¶¶ 96–97.

**D.      NYLL Notices Claims**

Under the NYLL, employers must provide employees with wage notices within ten business days of the start of employment. NYLL § 198(1-b). A wage notice must be written in English and "in the language identified by each employee as [his] primary language," and it must include several pieces of information, including the employee's pay rate and pay day. *See* NYLL § 195(1)(a); *Kone v. Joy Constr. Corp.*, No. 15 Civ. 1328 (LTS), 2016 WL 866349, at *5 (S.D.N.Y. Mar. 3, 2016). Every pay day, an employer must also provide its employees with an earnings statement, including the employee's name, hours worked at regular rates, hours worked at overtime rates, and net wages. *Id.*

As the Court discussed above, Herrera was never presented with a wage notice. The alleged wage notice provided by Defendants (Defendants' Exhibit 2) was dated February 23,

2015, more than ten days after Herrera began employment at Star Parking. *See* Defs.' Ex. 5 at 27 (showing Herrera earning money for the lot beginning January 22, 2015). Further, Defendants' Exhibit 2 was signed "Robeto H.R.," which is not the correct spelling of Herrera's name. *See* Defs.' Ex. 2. Herrera also testified that he never received a wage notice, which was corroborated by Guerrero's testimony. Tr. at 17:21–18:3, 44:25–45:4.

Both Herrera and Guerrero testified that they did not receive any type of wage notice, which this Court understands to include any earnings statements. Tr. at 17:21–18:3, 44:25–45:4.[23] Defendants did not present any testimony suggesting that they provided their employees with earnings statements; Kendrick testified that when Genao was out of the county, he gave employees envelopes that included their weekly pay and "a piece of paper," but he did not know what information, if any, was on the paper. Tr. at 115:22–15. Further, although there was significant testimony about Defendants' Exhibit 3, the "sign-up sheet" which, according to Defendants, included the employee's names, hours worked, pay rates, and wages, Section 195 requires that an employee be furnished with an earnings statement; Defendants' Exhibit 3 was kept and maintained by Genao. *See* NYLL § 195(3); Tr. at 99:2–24.

The Court therefore finds in favor of Plaintiff on his Sixth Claim. Under the Wage Theft Prevention Act, an employee was entitled to recover damages for violations of the wage notice requirement of $100 per work week (not to exceed $2,500) prior to February 27, 2015, and after February 27, 2015, could recover damages of $50 per work day, not to exceed $5,000. *See*

---

[23] Guerrero testified that his pay rate "would come on the checks that [he] would get." Tr. at 18:1–7. Guerrero is the only witness, including defense witnesses, to testify that employees of Star Parking were paid by check rather than cash. Even if Guerrero received a check that included his pay rate, that would not meet the standards of Section 195 of the NYLL, which requires that an earnings statement include the employee's dates of work during the pay period, the name and address of the employer, the pay rate, the overtime rate, any deductions, the regular hours worked, and the overtime hours worked. NYLL § 195(3).

*Marcelino*, 2018 WL 1517205, at *20; NYLL § 198(1-d).  For violations of the statutory earnings statement requirement, a plaintiff is entitled to $250 per work day that the violations continue, not to exceed $5,000.  *Id*.  Based on the Court's factual findings about the failure of Defendants to provide wage notices or earnings statements and Herrera's work schedule, he is entitled to recover the statutory maximum for each violation, which is $10,000 total.

### E.  Liquidated Damages

Under the NYLL, an employee is entitled to 100% of his underpaid wages as liquidated damages unless his employer can prove "a good faith basis to believe that its underpayment of wages was in compliance with the law."  NYLL § 198(1-a).  An employer must show that it "took active steps to ascertain the dictates of the FLSA and then act to comply with them." *Marcelino*, 2018 WL 1517205, at *18 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008)).  The employer's burden to prove that it acted in good faith is a "difficult one," as "double damages [are] the norm and single damages the exception."  *Barfield*, 537. F.3d at 150 (quoting *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 141 (2d Cir. 1999)).

Defendants offer the conclusory statement that they "should not owe any liquidated damages whatsoever to Plaintiff," but do not attempt to put forward evidence showing that they have met their burden of proof.  *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. 23) ¶ 5.  Nor can the Court find anything in the record that suggests that Genao or Star Parking were acting in good faith when failing to compensate Herrera fully for his work schedule.  To the contrary, the evidence presented at trial showed that Defendants' purported records were inaccurate, fabricated, or both.  *See* Defs.' Ex. 2; *compare* Pl.'s Ex. 1, *with* Defs.' Ex. 3.  The Court therefore grants Herrera liquidated damages in the amount of $24,983.

### F.     Prejudgment Interest

The NYLL also allows for the recovery of prejudmgnet interest at the statutory interest rate of nine percent per year.  *See* NYLL § 198(1-a) (stating that courts should allow recovery of prejudgment interest); N.Y. C.P.L.R. § 5004 (setting the statutory interest rate at nine percent per year).  Prejudgment interest is available only for an employee's damages due to underpayment, it is not recoverable on liquidated damages or statutory damages for notice violations.  *Marcelino*, 2018 WL 1517205, at *21.  Courts generally award prejudgment interest beginning from the midpoint of the plaintiff's employment within the statute of limitations period.  *Hengjin Sun v. China 1221, Inc.*, No. 12 Civ. 7135 (RJS), 2016 WL 1587242, at *6 (S.D.N.Y. Apr. 19, 2016); *Tackie v. Keff Enters. LLC*, No. 14 Civ. 2074 (JPO), 2014 WL 4626229, at *6 (S.D.N.Y. Sept. 16 2014).  Because the Court finds that Herrera began work on January 22, 2015 and ended work on February 28, 2016, the midpoint of his employment was August 11, 2015, and he is entitled to prejudgment interest beginning on that date.

### G.     Offset

Defendants seek an offset from any damages because Herrera "owes money to Defendants for the car payments he never made."  JPTO at 3–4; Doc. 23 ¶ 10.  But Defendants put forward no evidence of the amount of money owed to Genao, except for Genao's testimony that she was paid less than $2,000 for the car.  Tr. at 97:14–17.  Herrera testified that he paid Genao back in full.  Tr. at 57:4–21.  The Court declines to credit Genao's testimony based on the doctrine of *falsus in unun, falsus in omnium* and Genao's testimony regarding Star Parking's employment records, which the Court found to be false. The Court therefore declines to offset Plaintiff's damages.

## IV.    CONCLUSION[24]

For the reasons set forth above, Plaintiff has established that Defendants have violated the

NYLL's minimum wage, overtime, and notice provisions, but has not established jurisdiction

under the FLSA.  It is therefore ordered that:

1. Plaintiff is not entitled to recover damages on his first cause of action for unpaid overtime under the FLSA;

2. For his second cause of action for unpaid overtime under New York law, Plaintiff is entitled to $15,109.00 in unpaid wages, $15,109.00 in liquidated damages, and prejudgment interest at a rate of 9% beginning August 11, 2015;

3. Plaintiff is not entitled to recover damages on his third case of action for unpaid minimum wage under the FLSA;

4. For his fourth cause of action for unpaid minimum wage under New York law, Plaintiff is entitled to $6,690.00 in unpaid wages, $6,690.00 in liquidated damages, and prejudgment interest at a rate of 9% beginning August 11, 2015;

5. For his fifth cause of action for unpaid spread of hours pay under New York law, Plaintiff is entitled to $3,284.00 in unpaid wages, $3,284.00 in liquidated damages, and prejudgment interest at a rate of 9% beginning August 11, 2015;

6. For his sixth cause of action for violations of the notice provisions of New York law, Plaintiff is entitled to $5,000.00 for violations of Section 195(1) of the NYLL and $5,000.00 for violations of Section 195(3) of the NYLL; and

7. Counsel for Plaintiff may submit an application for attorney's fees by **August 6, 2018.**

It is SO ORDERED.

Dated:    July 5, 2018
              New York, New York

_____
Edgardo Ramos, U.S.D.J.

---

[24] Defendants do not seem to contest that if Star Parking is liable, Genao and Hernandez would also be liable as the joint owners of the unincorporated business.